462 F.2d 724
 Fed. Sec. L. Rep. P 93,539
UNITED STATES of America, Plaintiff-Appellee,
v.
Wendell Warren AUSTIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William E. BALES, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Irving Wellesley BEEMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles A. SAVIDGE, Defendant-Appellant.
 Nos. 72-1016 to 72-1019.
 United States Court of Appeals,
 Tenth Circuit.
 June 26, 1972.
Rehearings Denied Aug. 7, 1972.
 
 Darrell L. Johnson, Los Angeles, Cal., for appellant Wendell Warren Austin.
 Robert A. Coldsnow, Wichita, Kan., for appellant William E. Bales, Jr.
 Clyde Wendelken, Wichita, Kan., for appellant Irving Wellesley Beeman.
 Theodore H. Hill and Thomas H. Graber, Wichita, Kan., for appellant Charles A Savidge.
 Edward H. Funston, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., on the brief), for the United States.
 Before LEWIS, Chief Judge, DOYLE, Circuit Judge, and BRATTON, District Judge.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The above named defendants were tried and convicted on charges of securities fraud, contrary to 15 U.S.C. Sec. 77q and 18 U.S.C. Sec. 2 (aiding and abetting), and mail fraud, contrary to 18 U.S.C. Sec. 2314 (2), 18 U.S.C. Secs. 1341, 1342 and 1343 and 18 U.S.C. Sec. 2. The appellants were jointly charged with numerous other individuals in an indictment which contained a total of 50 counts. Each of the four defendants was convicted on count 5 of the indictment, a securities fraud charge, arising under Sec. 17 of the Securities Act of 1933, 15 U.S.C. Sec. 77q. In addition, appellant Austin was convicted on Count 8, mail fraud, 18 U.S.C. Sec. 1343 and 18 U.S.C. Sec. 2 (aiding and abetting). Appellant Savidge was convicted on Count 11 of violating 18 U.S.C. Sec. 1341 (mail fraud) and 18 U.S.C. Sec. 2 (aiding and abetting). Appellant Bales was in addition convicted under Count 6, 18 U.S.C. Sec. 2314 (2) and 18 U.S.C. Sec. 2; Count 9, (mail fraud) 18 U.S.C. Sec. 1343 and 18 U.S.C. Sec. 2 (aiding and abetting); Count 10, 18 U.S.C. Sec. 1341 (mail fraud) and 18 U.S.C. Sec. 2; and Count 11, 18 U.S.C. Sec. 1341 and 18 U.S.C. Sec. 2.
 
 
 2
 Most of the defendants filed motions for severance, which motions were denied. At the same time, the trial court, instead of proceeding on all of the counts contained in the indictment, severed out certain of the charges based on particular transactions and proceeded to trial on Counts 5, 6, 8, 9, 10 and 11 which arose from the so-called Horwitz dealings. The idea was that the defendants named in those counts of the indictment would be first tried and that separate trials would be held on other transactions. As it turned out, however, the only trial conducted was with respect to the mentioned counts, and the convictions on these counts are the only matters before us on appeal.
 
 
 3
 Prior to trial two of the defendants, Charles Krauthamer and Darel Martin, sought to enter pleas of nolo contendere which the court refused to accept, and subsequent to this refusal the defendant Krauthamer tendered a plea of guilty to one count of the indictment and the government offered to dismiss all other counts. This plea the trial court refused to accept. However, at a subsequent time before trial the court did allow the government to dismiss Counts 5, 6, 8, 9, 10 and 11 of the indictment as to the defendants Krauthamer and Edwin W. Prewitt.
 
 
 4
 As previously mentioned, there were numerous transactions, some of which were charged in the indictment and some of which were not. The bulk of these transactions was offered to show the existence of a plan, scheme or design to defraud and also for the purpose of showing the requisite criminal intent. The lead transaction was, of course, that in which one Gus Horwitz was named as the object of the scheme and artifice to defraud and which was set forth in Counts 5 through 11 (except 7).
 
 
 5
 The definitive count of the indictment in the Horwitz transaction was Count 5 which alleged that from a time prior to November 5, 1965, continuing to March 24, 1966, the defendants devised a scheme to defraud Horwitz by means of false pretenses, representations and promises constituting a scheme and artifice to defraud. Particularly, it was alleged that:
 
 
 6
 1. Defendants would provide loan commitments to Horwitz guaranteeing a loan in the amount of $750,000.00 and at the same time obtain a fee of $14,500.00 from Horwitz.
 
 
 7
 2. Lincoln Mortgage Company, Inc. and Investment Corporation of America were to obtain this loan.
 
 
 8
 3. False financial statements were given.
 
 
 9
 4. The scheme was executed by use of the mentioned financial statement together with the letter of commitment of Lincoln Mortgage Company for which the advance fee was paid by Horwitz. The letter of commitment was alleged to be a security.
 
 
 10
 The further counts mentioned above were, as noted, all based on the Horwitz transaction and all of these incorporate the allegations of Count 5 and contain jurisdictional allegations regarding the use of the mails.
 
 
 11
 The principal witnesses in the case were Gus Horwitz and one Frank McCall who was an associate of Horwitz. The evidence showed that Horwitz and McCall were Illinois residents and were engaged in real estate developing in Illinois. It was in connection with the interest of Horwitz in the acquisition of the Fox Valley Country Club in Aurora, Illinois which brought Horwitz into contact with the defendants. McCall learned of the existence of the Lincoln Mortgage Company, Inc. of Wichita, Kansas, having been told that it was in the business of issuing commitments for loans. Thereupon McCall telephoned Lincoln Mortgage and talked to defendant Bales who was Vice-President of this Wichita, Kansas company. At the request of Bales, McCall submitted certain documents. On November 9, 1965, Darel Martin, the Treasurer of Lincoln Mortgage, advised that the proposed loan would be submitted to the loan committee for its approval.
 
 
 12
 The evidence disclosed that the following transpired:
 
 
 13
 1. Bales told McCall and Horwitz over the telephone that Lincoln Mortgage would grant the loan if they would come to Wichita and deposit a $15,000.00 initial fee.
 
 
 14
 2. On November 29, 1965, McCall and Horwitz received copies of a commitment letter signed by Martin purporting to grant a first mortgage loan in the amount of $750,000.00. This was not an outright commitment but a back-up commitment guaranteeing the making of the loan by others.
 
 
 15
 3. After receiving the commitment letter, McCall and Horwitz flew to Wichita for the purpose of assuring the funding of the commitment.
 
 
 16
 4. A check for $7,500.00 was presented to Bales and another check for $7,000.00 was given to Lincoln Mortgage Company soon after that in payment of the initial commitment fee. McCall paid the remaining $500.00.
 
 
 17
 5. On the occasion of this visit McCall and Horwitz were introduced by Bales to appellant Savidge, who said that his firm, Savidge and Associates, Inc. of Kansas City, Missouri would provide interim financing (emphasis supplied).
 
 
 18
 6. A funding agreement was worked out between Savidge and Horwitz, and the latter left Wichita believing that the interim financing would be processed by Savidge in a few days and the money would be available immediately thereafter. Another $22,500.00 in commitment fees was due and payable at the time of interim funding. The interim financing never materialized and hence this sum did not become due and payable.
 
 
 19
 7. On December 10 Savidge sent a letter to McCall and Horwitz saying that his company had given its verbal approval of the loan.
 
 
 20
 8. During the ensuing delay there were numerous telephone conversations in which appellant Savidge stated the money was set and only awaited completion of the paper work. Horwitz was required to renegotiate his option to purchase the country club.
 
 
 21
 9. Because of questions as to the financial backing of Lincoln Mortgage, Horwitz was furnished with a guarantee from another company, the Continental Leasing Corporation, together with a letter of reference from a Dallas bank in respect to Continental Leasing Corporation.
 
 
 22
 10. On December 22, 1965, Horwitz and McCall received a letter confirming the funding agreement with Savidge and Associates.
 
 
 23
 11. At the same time Horwitz and McCall received another letter from still another firm, Investment Corporation of America, signed by one Edwin W. Prewitt, President (Horwitz testified that he had never previously heard of either Prewitt or Investment Corporation of America).
 
 
 24
 12. On December 20, on the occasion of a McCall visit to Wichita, it was learned from appellant Bales that Lincoln Mortgage would not fund the commitment, but that Investment Corporation of America would. The necessary papers to effectuate this were executed and a copy of this undertaking of Investment Corporation was sent to the seller of the country club.
 
 
 25
 13. On December 23 Savidge and Associates sent a telegram to McCall advising that it would fund the commitment within 90 days on receipt of documentation from Investment Corporation of America. A week later McCall received a copy of a purported financial statement of Investment Corporation of America.
 
 
 26
 14. On December 27 Savidge and Associates sent another telegram to McCall again stating readiness to proceed with funding on receipt of complete information and documentation from Investment Corporation of America. Contemporaneously Savidge explained by telephone that he was waiting for Investment Corporation of America's financial statement and information as to its method of providing the long-term financing.
 
 
 27
 15. Thereafter additional balance sheets of Investment Corporation of America were sent to McCall and Horwitz together with an announcement of the acquisition by Investment Corporation of America of a new silver mine in Colorado.
 
 
 28
 16. On February 4, 1966, McCall received a letter from Prewitt of Investment Corporation of America apologizing for the delay.
 
 
 29
 17. On February 14 a telegram from Savidge and Associates was sent to McCall promising to close the loan February 24 on which day Savidge was to come to Aurora, Illinois to deposit money in a local bank.
 
 
 30
 18. On the appointed day two telegrams were received, one from Investment Corporation of America signed Prewitt, stating displeasure that the interim financing had not been provided, and the second from Savidge stating that Prewitt had told him not to close the loan.
 
 
 31
 19. Next, Savidge called from Chicago advising McCall to contact Prewitt, and, on calling, Prewitt was told that he, Prewitt, could not understand what the trouble was, but that funds would be available; that they had somebody in Hollywood and somebody in Lake Tahoe (ready to advance the money).
 
 
 32
 20. McCall warned Prewitt that "We are at the end of the line now and we are getting ready to go to the authorities on it and we want our money back."
 
 
 33
 21. Some days later McCall spoke to Prewitt and talked also with appellant Austin who was present with Prewitt. Austin advised that he had a depositor with brokerage money.
 
 
 34
 22. Austin, on March 3, 1966, sent a confirming telegram that he had an investor with $750,000.00 cash which would be deposited by wire with a savings and loan institution. When McCall attempted to use the telegram he learned that the Home Building and Loan bank in Aurora would not accept such a compensatory deposit.
 
 
 35
 23. On March 4 McCall received a telegram from defendant Beeman, as President of Executive Title and Trust Company (still another company) in Incline Village, Nevada, advising that Executive Title was holding a trust deposit to back up the Investment Corporation of America commitment.
 
 
 36
 24. Finally, McCall and Horwitz sent a demand letter to the various companies demanding the return of their money. A complaint was then made to the Postal authorities when other financing was completed.
 
 
 37
 Krauthamer and Prewitt testified as government witnesses at the trial of the four named defendants on Counts 5, 6, 8, 9, 10 and 11. Following conviction of the four named defendants on some or all of the counts of the Horwitz transaction, the government elected not to proceed with the other transactions which had been severed out. It dismissed these counts not only as against the four defendants and Martin, but also as against Prewitt and Krauthamer. Also subsequent to the trial certain of the other defendants were allowed to plead to lesser charges which were set forth in a superseding information. These individuals were granted probation.
 
 
 38
 Testimony as to the allegedly false financial statements was offered through Krauthamer who had been a defendant but who was dismissed. He is shown to have been a Certified Public Accountant, and from him it was learned that the financial statements were prepared based upon information given to him by Prewitt. In this manner he prepared statements for both Lincoln Mortgage Company and Investment Corporation of America. He made no real effort to check the financial data furnished to him by Prewitt. According to Prewitt's testimony he lacked personal knowledge as to the numbers that he had given to Krauthamer, but he said that he assumed that Childs was wealthy and that what he had been told was true.
 
 
 39
 It is to be noted that one Kenneth Childs appeared to be the central figure in Lincoln Mortgage and in the operation generally as a whole. Childs died prior to the trial, and it is the tendency of the defendants at bar to shift the blame to him and to say that they were dupes. The defendant Darel D. Martin, who was Secretary of Lincoln Mortgage, died pending this appeal.
 
 
 40
 In addition to the Horwitz-McCall transaction there were numerous others offered on the theory of similar acts and transactions to estabish the mode of operation and to prove plan, scheme, design, knowledge, intent and participation in the operation as a whole of the other defendants. The pattern in each of these other transactions was substantially the same as that shown in the Horwitz transaction. It called for the payment of an advance fee followed by an interim financing fee and the use of a commitment letter plus numerous guarantees, and as in the case at bar the defendants and corporations were freely substituted for the obtaining of the money (which, according to the prosecution, was the primary purpose for the defendants' activity) or to maintain the level of the borrower's confidence. The government's theory was that the scheme was a so-called advance fee loan scheme or device.
 
 
 41
 This case was tried over a period of six weeks and was in preparation for more than two years. The post-conviction motions and proceedings required at least an additional three or four months following the conviction which occurred September 3, 1970. There were extensive pretrial proceedings at which the defendants were furnished full opportunity to examine the proposed exhibits and other evidence which was to be relied on by the government in its effort to obtain convictions.
 
 
 42
 The defendants raise numerous arguments, most of which deal with the manner of conducting the trial. For example, the alleged error of the court in receiving some of the evidence of similar offenses prior to receiving evidence as to the details of the Horwitz acts and doings, and complaint is made that the court did not finally rule on the admissibility of the exhibits at the time that these exhibits were identified and offered. Instead the trial court reserved final ruling until the latter days of the trial. Defendants also complain about the vast number of exhibits that were received, some of which were not shown, it is contended, to have been tied to particular defendants.
 
 
 43
 All of the defendants maintain that the trial was marked by mass confusion and that they were thereby deprived of a fair trial. Most of these arguments are not specific and pointed, whereby particular evidence can be considered, and thus it is impossible to test and evaluate these arguments.
 
 
 44
 From a reading of all of the briefs we have concluded that the numerous and varying contentions can best be considered under the following headings:
 
 
 45
 1. The sufficiency of the evidence as to each of the defendants.
 
 
 46
 2. Whether the defendants were entitled to a severance.
 
 
 47
 3. Admissibility of the similar offenses and whether the court erred in allowing some of the similar offenses to be received in evidence prior to the presentation of the Horwitz transaction.
 
 
 48
 4. Whether the court erred in reserving ruling on the relevance and materiality of the exhibits until the close of all the evidence.
 
 
 49
 5. Whether the court erred in its holding that the November 29 commitment letter of Lincoln Mortgage was in law a security within the meaning of Sec. 17 of the Securities Act of 1933 and whether there was a factual issue in connection with the submission of this letter.
 
 SUFFICIENCY OF THE EVIDENCE
 
 50
 The defendants were, as noted above, all charged with both securities fraud and mail fraud, and all except one of the defendants were convicted on counts of the indictment which charged violations of both statutes. Accordingly, it was incumbent on the government to establish in accordance with the charge that the defendants employed a scheme or artifice to defraud and that they executed it by means of false pretenses, representations and promises, all for the purpose of obtaining the payment of advance fees amounting to a total of $37,500.00, the initial fee being $15,000.00.
 
 
 51
 Section 17 of the Securities Act of 1933, 15 U.S.C. Sec. 77q, declares unlawful the offer or sale of any security by the use of instruments of interstate commerce involving the employment of a device, scheme or artifice to defraud. The mail fraud statute similarly prohibits the device of a scheme or artifice to defraud or obtaining money by means of false pretenses, representations or promises coupled with the use of the mails in the execution of said scheme or artifice. So the elements of the two offenses are similar although not the same. One difference is that the defendant in a securities fraud case must have sold or offered to sell a security and the scheme or artifice to defraud must have been employed in connection therewith. The security element is discussed hereinafter under a separate heading.
 
 
 52
 The defendants were also alleged to have aided, abetted, counseled, commanded, induced or procured commission of an offense contrary to 18 U.S.C. Sec. 2.
 
 
 53
 The defendants do not seriously contend that the government failed to produce evidence to establish the existence of an artifice or scheme to defraud. Rather, the emphasis is on the lack of evidence to support the conviction of the defendants individually. We hold, however, that the evidence is amply sufficient to justify conviction of each of the defendants and of all of them.
 
 
 54
 The evidence clearly establishes that this was a cooperative venture in which each of the four defendants and others played an integral part. We need not determine whether Childs was the central figure because he is not before the court and it is not essential that the principal in the enterprise be identified as long as some person was principal. See Colosacco v. United States, 196 F.2d 165, 167 (10th Cir. 1952), and Hendrix v. United States, 327 F.2d 971, 975 (5th Cir. 1964). Not only was it a cooperative enterprise, but it was also shown to have been fraudulent. It is true that it took the form of valid transactions, but this is not uncommon and, despite the use of contracts and other forms common to ordinary business transactions, the fraudulent character of the endeavor was not thereby disguised.
 
 
 55
 From the facts which have been outlined, it is manifest that the Horwitz transaction was itself shown to have been corrupt. This type of advance fee loan transaction, in which a loan never comes to pass and in which the fee is obtained by various forms of promises and representations that a loan will be forthcoming, is a familiar method for obtaining money from members of the public who are desperately in need of financing and cannot obtain it through ordinary sources. The borrower, even though he is sophisticated in the ways of business, is necessarily impressed by the front presented-the facade of documents and corporations-so that he does not suspect that its purpose is to obtain his money and to merely promise him a loan. This fact, however, at last emerges from the failure to fulfill the commitment and from the numerous other transactions, all of which operate in the same general manner and none of which ever produce the promised financing. If it were necessary in law for each individual to have participated at each and every stage of the process (the preliminary stage, the obtaining of the fee stage and the very lengthy stalling stage), there could be a problem. However, the aiding and abetting statute which is specifically alleged and cited in the indictment renders this unnecessary by declaring that one who aids, abets, counsels, commands, induces or procures the commission of an offense is a principal.
 
 
 56
 In the case at bar the four defendants were shown to have had substantial participation in the Horwitz transaction. Initially appellant Bales was involved at the preliminary stages as was the defendant Darel Martin, since deceased. Bales had the original communication with McCall and Horwitz, and Martin signed the commitment. On the occasion of their first visit to Wichita they came into contact with appellant Savidge and were introduced to the notion of interim financing which in turn called for an additional payment of $22,500.00. Soon thereafter Edwin Prewitt came into the picture through Investment Corporation of America, a substitute funding company. There followed communications between Horwitz and Savidge and Horwitz and Prewitt in which Savidge and Prewitt sought to blame the delay on one another. Finally, appellant Austin came on the scene also promising to come forward with the funds, and in the final stages appellant Beeman and his Executive Title and Trust Company of Incline Village, Nevada came forward as a guarantor. Thus, each of these four named defendants and others played a part, first, in the obtaining of the money and the sale of the commitment letter, and, secondly, in stalling Horwitz and McCall and in quieting their apprehensions and anxieties. Thus, there was a scheme and device which was continuing. It did not cease once the initial amount of $15,000.00 was paid. The purpose of the continuation of the scheme was to prevent disintegration of the first part involving the obtaining of the money. The remaining three points (three percent) in the amount of $22,500.00 had not been collected and remained an objective.
 
 
 57
 Under the aiding and abetting statute, once the device, scheme or artifice to defraud has emerged, the question is whether one has participated in the criminal transaction or transactions shown to have been perpetrated. See United States v. Harris, 441 F.2d 1333, 1336 (10th Cir. 1971); King v. United States, 402 F.2d 289, 290-291 (10th Cir. 1968); White v. United States, 366 F.2d 474, 476 (10th Cir. 1966); Roth v. United States, 339 F.2d 863, 865 (10th Cir. 1964); Colosacco v. United States, 196 F.2d 165, 167 (10th Cir. 1952).
 
 
 58
 It is, of course, essential that a defendant willfully and knowingly associated himself with the unlawful venture and willfully participated in it as he would in something he wishes to bring about or to make succeed. See King v. United States, supra, and Roth v. United States, supra.
 
 
 59
 The fact that two of the defendants, namely, Beeman and Austin, surfaced as a part of the Horwitz transaction at a relatively late stage does not excuse them, if in fact they aided and abetted the commission of the offense. It is inferable from the evidence that both of these appellants embraced the enterprise and ratified it in that they were helping to preserve the fruits of the transaction and thus carrying out its objectives. It was for the jury to assess whether they acted with knowledge.[1] The numerous similar transactions attest to their participation, for in some instances the evidence shows that they took the lead.
 
 
 60
 Indeed, the similar transactions shed light on the existence of the scheme or artifice to defraud and the willful participation of all four of the defendants. One noteworthy fact revealed by these is that not a single loan was shown to have been placed or consummated.
 
 
 61
 A summary of most of these similar offenses is appended to this opinion. They demonstrated in clear terms that the defendants acted with the requisite corrupt intent.
 
 
 62
 We conclude that the evidence is much more than sufficient.
 
 II.
 THE SEVERANCE QUESTION
 
 63
 The defendants sought trials separate and apart from their codefendants on the ground that there was evidence admissible against codefendants which was at the same time inadmissible as to them. The trial court denied this motion, but did sever the transactions for the purpose of trial. In determining that the Horwitz series of counts would be tried first, it was contemplated that the other transactions which were alleged in other counts of the indictment would be tried subsequently. As it turned out, the subsequent trials did not take place, and now it is argued that the court's acceptance in evidence of numerous transactions as similar offenses other than the Horwitz series of events resulted in a substantial prejudice.
 
 
 64
 In examining the motions we note one obvious deficiency-their attack is broadside; they fail to document the prejudicial evidence. Appellant Savidge does say that he was involved in only eight of twenty transactions. As shown by the Appendix, the defendants Bales, Savidge and Austin were prominent participants in numerous of the transactions during the entire period of the illegal enterprise. It is true that appellant Beeman's role was less prominent than the others. He did take positive action in the substantive offense, the Horwitz events, in that he offered a back-up or guarantee and utilized one of his corporate names, Executive Title and Investment Company, for the purpose. He participated also in the Jones, Jones and Hobbs incidents, and although he came in late it was open to the jury to conclude that he embraced the early events which started in 1964. Significantly he was engaged actively and prominently in two of the later transactions, the W.A.A. Oil transaction and the Glen Dornie transaction, both of which commenced in the fall of 1966, and so from early 1966 forward he was shown to have been a participant.
 
 
 65
 It is axiomatic that the granting of a severance so as to avoid a joint trial with others is a matter of discretion, and it is most difficult for the judge to gauge possible prejudice in a case such as the present one at the time the motion is made. This is especially true where, as here, the motion is a naked one which gives the trial court no specific evidence of prejudice.
 
 
 66
 Professor Moore points out that if all that is necessary to avoid a joint trial is a showing of prejudice, there would be few, if any, multi-defendant trials. 8 Moore's Federal Practice p 14.04. The author goes on to say:
 
 
 67
 * * * This is because the very fact of joinder is prejudicial to one or more of the defendants. Thus, the following inherently prejudicial factors do not give rise to severance: that another defendant is charged with more serious offenses, that defenses of codefendants are generally antagonistic, or that defendant is subjected to additional expense by the joint trial. What these decisions ultimately come down to is this: A defendant is not entitled to a separate trial "merely" because it might offer him a better chance of acquittal.
 
 
 68
 The problem of inherent prejudice is particularly acute in conspiracy cases. It is common for defendants in these cases to defend themselves by shifting blame to each other. Thus, the prosecutor's job is made easier. In addition, the conspiracy charge offers the prosecution exceptional procedural advantages because statements made by any co-conspirator "in furtherance of the conspiracy" are admissible against all. Even where evidence against one defendant is not technically admissible against another defendant, it may still be admitted, subject only to "limiting instructions" to the jury.
 
 And Judge Learned Hand has said:
 
 69
 That they may be convicted merely because of their association is possible, though it is certainly no more than a speculation to assume so; but there is no practical alternative except, as we have said, to give them immunity. The chance that a joint trial will not as to them be a fair trial, has to be balanced against the fact that it is a joint trial or none. Indeed, if we were to accept the argument, there would really be an end of trials for jointly conceived, or jointly executed, crimes, except in cases of the simplest character.
 
 
 70
 United States v. Cohen, 145 F.2d 82, 95-96 (2d Cir. 1944). And so faced with a series of lengthy trials on the varying transactions, the trial court no doubt deemed it impossible to sever even further by separating the defendants, and undoubtedly he regarded it as impractical to do so in view of the fact that a common scheme was charged which had continuity of purpose and similarity of method. We cannot say that the decision to proceed as the trial court decided, by severing the transactions and cautious use of limiting instructions, constituted prejudicial error as to any of the appellants, including Mr. Beeman.
 
 
 71
 Throughout the trial the court repeatedly instructed the jury that, as a necessary prerequisite to consideration of the similar offenses, the evidence must first establish the doing of the act charged in the indictment by the particular defendant. The court went on to instruct the jury that if the guilt of the defendant were established in the main charge, only then could the jury consider evidence of an alleged act of a like nature insofar as it established the state of mind or intent in respect to the offense charged and only insofar as the act was part of a uniform scheme or plan of operation on the part of the accused. The several instructions given were extensive, and finally the judge repeated the admonition in his final charge.
 
 
 72
 The condition here is not unlike that which was presented to this court in Beckwith v. United States, 367 F.2d 458 (10th Cir. 1966). There the appellants argued that evidence as to a coactor, one Jones, had been erroneously received involving as it did Jones' acts at a date prior to the earliest date that Beckwith had been identified with the fraudulent scheme. The trial court held there, however, that the evidence was admissible against Beckwith and his codefendant Hayden if they had knowingly and willfully participated in the scheme and that the questioned statements pertained to, and were in pursuance of, that scheme. The court held that neither the testimony nor the instruction called for reversal.[2]
 
 
 73
 The present case is much more similar on its facts to Lowther v. United States, 455 F.2d 657 (10th Cir. 1972), wherein it was concluded that there was evidence of a scheme to defraud and participation by the defendants in it. Similarly, our decision in Glazerman v. United States, 421 F.2d 547 (1970), is not inconsistent with our present ruling. The holding in Glazerman was that the defendants could not be found guilty of substantive offenses which had occurred prior to their entry into the conspiracy, and thus the question in Glazerman was not one of admissibility of similar offenses.
 
 
 74
 Finally, neither Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1949) nor Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which are relied on by the appellants, is applicable. Both of these were concerned with extra-judicial inculpatory statements which had been made by co-conspirators subsequent to consummation and termination of the conspiracies.
 
 
 75
 We perceive no prejudicial error in the rulings of the court with respect to the admissibility of this evidence or in the court's denial of the defendants' motions for severance.
 
 III.
 
 76
 ALLEGED ERROR ARISING FROM TRIAL COURT'S RECEIVING EVIDENCE
 
 
 77
 OF SIMILAR TRANSACTIONS PRIOR TO PROOF IN SUPPORT
 
 OF THE SUBSTANTIVE CHARGES
 
 78
 We have sufficiently discussed the relevancy of the similar transaction evidence and the specific problems which have arisen in connection with the individual defendants. It remains to consider whether there was a gross abuse of discretion in the order of proof. Some of the defendants at least contend that they were denied a fair trial and deprived of due process of law because the trial court allowed the district attorney to postpone presentation of proof in support of the Horwitz transaction (Counts 5, 6, 8, 9, 10 and 11) and to proceed first to call witnesses to the similar transactions. The argument is that it produced mass confusion.
 
 
 79
 First, the evidence in support of the Horwitz transaction was substantial. Second, the difference between this evidence and the evidence regarding the similar transactions offered for limited purposes was made clear to the jury. What the defendants are complaining about is the immense scope and extent of the similar transaction evidence, but this again was a discretionary matter. In Beckwith v. United States, supra, it was said:
 
 
 80
 * * * While testimony as to things done or said by one of the co-actors is admissible if there is evidence that the defendants were active participants in the fraudulent scheme, the court may, in its discretion, permit the proof of participation to follow evidence as to things said and done by the confederate, as was done in the case here. Briggs v. United States [10 Cir., 176 F.2d 317], supra; Bartlett v. United States [10 Cir., 166 F.2d 920], supra.
 
 
 81
 367 F.2d at 460.
 
 
 82
 In the case at bar this variation in the order of proof would appear to have been for the purpose of accommodating certain of the witnesses. In view of the care taken by the trial court in instructing the jury, and having in mind that the several transactions were, although quite similar in pattern, distinct in other respects, we are unable to share the views of counsel that this constituted prejudicial error.
 
 IV.
 POSTPONEMENT OF RULINGS ON EXHIBITS
 
 83
 Nor can we find error in the action of the court with respect to exhibits. It appears to us that the trial court received the exhibits conditionally and subject to a final ruling when all of the evidence was in. Counsel could not have been misled into believing that these exhibits might not be received because all of the indications were to the contrary. The judge simply wished to finally decide the matter in the light of the testimony.
 
 
 84
 It is also important to consider the fact that the defendants through their lawyers had had access to these exhibits prior to and during the trial and, therefore, there was no element of surprise. Once again it is the vast extent of the documents which is the main source of complaint. The words of Judge Learned Hand in United States v. Cohen, supra, are fully applicable here:
 
 
 85
 * * * The chief complaint, often repeated, we have already considered; it is that the evidence was so manifold and complicated that the jury was sure to be confused and lose track of the real issues. We shall add nothing to what we have said except that, if the objection is valid, a prosecutor, faced with such a web, will be forced to single out the most important malefactors and let the small fry escape; for the burden upon the witnesses and upon successive juries of repeated trials would be intolerable.
 
 
 86
 ***
 
 
 87
 * * *
 
 
 88
 145 F.2d at 91.
 
 
 89
 Defendants also argue that the exhibits were not adequately identified. The fact that copies rather than originals were used is, of course, of no significance, and it is not claimed that any of the documents were not authentic or genuine. So this point is also non-meritorious.
 
 V.
 
 90
 THE RULING THAT THE COMMITMENT LETTER WAS AS A MATTER OF LAW
 
 A SECURITY
 
 91
 All of the defendants have centered on the present issue contending that it is improper for the trial court in a criminal prosecution to fail to submit each and every issue to the jury. In its instruction the court read the statute to the jury and went on to state that if there was a letter of commitment, that as a matter of law such was a security within the meaning of the statutory definition.[3] 3] We are of the opinion that the action of the trial court was not reversible error.
 
 
 92
 The intent of Congress was that the Securities Act and the term "security" should be construed broadly. See Lehigh Valley Trust Company v. Central National Bank of Jacksonville, 409 F.2d 989 (5th Cir. 1969), which relied on Tcherepnin v. Knight, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967) and S.E.C. v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed. 2d 668 (1969), and see Llanos v. United States, 206 F.2d 852, 854 (9th Cir. 1953), showing that this is not in conflict with the idea that criminal statutes must be strictly construed considering that this construction carries out the Congressional intention as to the Securities Act.
 
 
 93
 The term "evidence of indebtedness" is not limited to a promissory note or other simple acknowledgment of a debt owing and is held to include all contractual obligations to pay in the future for consideration presently received. See Keller v. City of Scranton, 200 Pa. 130, 49 A. 781, 782 (1901), and Nelson v. Wilson, 81 Mont. 560, 264 P. 679, 682 (1928).
 
 
 94
 Although there is little authority under the Securities Act or the Securities and Exchange Act, the construction given to the term "security" in the Stolen Property Act, 18 U.S.C. Sec. 2311, recognizes the property right aspect of this term.[4]
 
 
 95
 It is true that the letter of commitment is not an indicium of debt in the same sense as is a promissory note, but as used in the Securities Act no such restriction is appropriate. In last analysis, this letter of commitment was sold for a substantial consideration, and the buyer received what appeared to be an enforceable obligation which contemplated the flow of funds. It indicated a binding and legally enforceable right. Therefore, we can find no fault with the ruling of the trial court insofar as it regarded the letter of commitment as plainly being a security.
 
 
 96
 The remaining question is whether the trial court should nevertheless have put the issue to the jury. The Fifth Circuit has held that it was reversible error to fail to do so under conditions which were not substantially distinguishable. Roe v. United States, 287 F.2d 435, 440 (5th Cir. 1961). On the other hand, the Supreme Court has recognized the right of a trial court to determine as a matter of law that a security is a security where it is such on its face. Securities and Exchange Commission v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 351-353, 355, 64 S.Ct. 120, 88 L.Ed. 88 (1943), and our court in a civil case has gone so far as to hold that it was error for the trial court to submit the question to a jury. Ahrens v. American Canadian Beaver Co., 428 F.2d 926, 928 (10th Cir. 1970).
 
 
 97
 It is unquestionably desirable to submit all issues in a criminal case to the jury and to fail to do so, even where the issue appears clear to the judge, is potentially dangerous and at best hazardous. See the discussion of Professor Moore, 8 Moore's Federal Practice 30-11, Sec. 30.05 in which the author discusses the Supreme Court's decision in Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185 (1920), wherein the Court in an opinion by Mr. Justice Holmes went to an extreme length in upholding a judgment where the trial court had practically directed a verdict of guilty.[5]
 
 
 98
 The facts in our case are not comparable with those involved in Horning in which virtually the entire issue was taken away from the jury. Nevertheless, we are not to be understood as approving action of a trial court in failing to go through the motions at least of submitting the issue to the jury even though the question appears to him to be palpably lacking in factual character. At the same time, in this six-week trial involving 7,000 pages of testimony and hundreds and hundreds of exhibits, establishing guilt beyond all reasonable doubt, we do not believe that reversal would be justifiable.
 
 VI.
 
 99
 Nor do we see error in the trial court's reserving ruling on the motion for acquittal which was interposed at the conclusion of the government's case. The cases considering the issue have uniformly held that such action is not prejudicial where the evidence sustains the allegations of the indictment at the time the government rests. See United States v. Day, 438 F.2d 121 (5th Cir. 1971); Sullivan v. United States, 414 F.2d 714 (9th Cir. 1969); Montoya v. United States, 402 F.2d 847 (5th Cir. 1967); Moore v. United States, 375 F.2d 877 (8th Cir. 1967); United States v. Godel, 361 F.2d 21 (4th Cir. 1966); and Weathers v. United States, 322 F.2d 566 (9th Cir. 1963). Cf. United States v. Wininger, 427 F.2d 1128 (6th Cir. 1970). As was pointed out by the court in Weathers, supra:
 
 
 100
 Assuming that it is error to reserve ruling on a motion for acquittal at the conclusion of the Government's case, and assuming the error was not waived by the introduction of evidence in defense, such error could not possibly be considered prejudicial unless the evidence was such that the court should have granted the motion. Prejudice does not exist here.
 
 
 101
 322 F.2d at 568.
 
 
 102
 We have not overlooked defendants' contention that prejudice is shown in connection with the multiple counts based on one factual transaction but on numerous mailings. Each of these gives rise to a separate offense.[6]
 
 
 103
 The judgments are affirmed.
 
 
 104
 APPENDIX TO UNITED STATES OF AMERICA v. WENDELL WARREN AUSTIN, et al.
 
 Nos. 72-1016 through 72-1019
 SUMMARY OF THE SIMILAR OFFENSE EVIDENCE
 
 105
 The largest part of the trial, of course, was taken up with evidence regarding other offenses. The government introduced a tremendous volume of similar offense evidence in an attempt to show a continuing plan or scheme, with full participation by all defendants in the overall scheme even though the participation of particular individuals in any single transaction may have been only peripheral.
 
 
 106
 The usual pattern of the similar offenses was as follows:
 
 
 107
 (1) Through different media, ranging from advertisements in The Wall Street Journal to local word of mouth, defendants would attempt to interest both mortgage brokers and potential seekers of mortgage money for their own purposes in coming to one of defendants' various corporations.[1]
 
 
 108
 (2) The most frequently used corporate vehicle for initial dealing was Lincoln Mortgage Corporation. At the outset defendants would request the "applicant" to furnish a "loan package" consisting of data on the proposed use for the money.
 
 
 109
 (3) The "loan package" was invariably approved, although sometimes not until the "applicant" had gone through several submissions and perhaps through lengthy "evaluation" sessions with one or more of the defendants.
 
 
 110
 (4) When the "applicant" was notified that his "package" or application had been approved, he was also told the cost of the loan, which varied between one and ten percent of the total amount.
 
 
 111
 (5) At some point in the process, usually before payment of the fee, advice was given as to the loan's being a "stand-by" or "take-out" commitment, whereby Lincoln Mortgage (or the corporation with which the "applicant" was dealing) was agreeing to pick up the loan on a long-term basis (ten to twenty years), but only after the passage of some months, usually twelve to twenty-four, after the making of the agreement.
 
 
 112
 (6) The "applicant" would then generally inquire as to where he was to get the money in the meantime to pay builders and the like (the projects were usually of such a nature that no bank would be willing to assume the risk).
 
 
 113
 (7) In response to this inquiry, defendants would promise to arrange interim financing, usually for an additional fee to be paid the interim financer. Sometimes a less devious approach was used, whereby the letter of commitment stated that it was for a standby commitment which would only become effective upon the completion of the project in question; this left the "applicant" to procure his own interim financing, a fact which he generally did not realize until too late.
 
 
 114
 (8) The "interim financer" was always one of the other defendants, including a Mr. Reamer of Baltimore who was a co-defendant not involved in the Horwitz transaction. Usually a fee was actually paid for the interim financing, although some victims had become too suspicious by this stage of the proceedings to put in more money. In any event, no interim financing was ever forthcoming.
 
 
 115
 (9) Of course, no "take-out" financing was ever forthcoming, either. Various ploys were used to stall and quiet the fears of the "applicant". He was shifted around from corporation to corporation from California to Vermont, pursuing missed deadlines, securing eleventh-hour extensions on closings, and the like. Eventually, many gave up the battle, secured other financing (or lost the project in which they were involved), and forgot about defendants. Some, however, filed civil suits against various defendants; these suits were generally successful as far as obtaining judgments, but unsuccessful in satisfying these.
 
 
 116
 (10) Ordinarily there was no restitution of fees paid. There were isolated instances of some restitution, however; this was usually partial, occasionally complete, and invariably greatly delayed.
 
 
 117
 No purpose would be served by outlining each of the numerous other transactions presented at trial. We have reviewed the Appendix (consisting of twenty-seven volumes) as presented to us, and evaluated the evidence presented. It fully supports the existence of an on-going, carefully designed scheme to defraud persons seeking equity capital or mortgage money.
 
 
 118
 Different individuals played central roles in the various transactions disclosed in the testimony. Thus, while in the instant Horwitz transaction the central characters were Bales and Savidge, with Beeman and Austin playing lesser roles, the reverse was frequently true. For illustrative purposes, there follows a listing of other transactions together with an indication of which defendant or defendants played a major role therein:
 
 
 119
 A. The Montgomery transaction (designated by the Government as KC #14), which went on roughly from February 1964 to March 1965. Austin played the central role here, acting for Lincoln Mortgage.
 
 
 120
 B. The Saxton transaction (KC #63), April 1964 to May 1965; Bales was primary, acting for Lincoln Mortgage.
 
 
 121
 C. The Langner transaction (KC #64), June 1964 to December 1965. Bales was central. Martin also participated, as did Childs.D. The Jones, Jones & Hobbs transaction (KC #1), April 1964 to April 1967. This extensive transaction centered around Bales and Austin, with Beeman playing a small but important part. Martin participated, as did Childs.
 
 
 122
 E. The Torgler transaction (KC #60), December 1964 to June 1966. This transaction involved most of the defendants, but seemed particularly to concern Bales and Savidge. Childs, Martin and Austin also took part.
 
 
 123
 F. The Okamoto transaction (KC #15), May 1965 to November 1965. Centered around Austin and Savidge. Bales also took part.
 
 
 124
 G. The Sirotin transaction (KC #3), June 1965 to September 1966. Particularly involved Bales and Savidge. Martin and Childs also took part.
 
 
 125
 H. The Cadenhead-LaFargue transaction (KC #66), August 1965 to April 1966. Centered around Savidge, with Martin and Childs participating.
 
 
 126
 I. The Haag transaction (KC #22), October 1965 to October 1966. Centered around Bales, with Martin and Childs participating.
 
 
 127
 J. The Williams-Rentner transaction (KC #24), April 1966 to July 1967. A substantial transaction in which Bales and Savidge were important; Childs and Martin played some part.
 
 
 128
 K. The W.A.A. Oil transaction (KC #27), Fall 1966 to June 1967. A large transaction most directly influenced by Bales and Beeman, with Martin participating.
 
 
 129
 L. The Glen Dornie transaction (KC #27), October 1966 to July 1967. Of the present defendants, Beeman was essential to this transaction, which again was fairly extensive. Bales, Childs and Martin also participated.
 
 
 130
 M. The Jackson Nursing Home transaction (KC #48), December 1966 to November 1967. Particularly involved Bales and Savidge, with Martin participating.
 
 
 131
 N. The Foundation Life Insurance Co. series (KC #56), February 1967 to April 1967. This series of events centered around Bales and Savidge, with Martin and Childs being involved.
 
 
 132
 The government introduced evidence relating to numerous other incidents and transactions as well, but the foregoing list includes only those which can be regarded as more important and fully supported. The central role in the overall scheme was carried out by the decedent Childs, but this fact does not detract from the contributions of the named defendants. They were shown to have knowingly and intentionally participated in the activities charged in the indictments.
 
 
 
 [1]
 In the words of Judge Learned Hand in United States v. Paglia, 190 F.2d 445, 448 (2d Cir. 1951), to be an accessory one must:
 . . . make the venture his own; the crime must be a fulfillment in some degree of an enterprise which he has adopted as his; his act must be in realization of his purpose.
 190 F.2d at 448.
 See also Nye & Nissen v. United States, 336 U.S. 613, 620, 69 S.Ct. 766, 93 L.Ed. 919 (1949), and Wyatt v. United States, 388 F.2d 395 (10th Cir. 1968).
 
 
 [2]
 The opinion is unenthusiastic about the instruction used, but noted that there had been no objection to it. In the case at bar the problem is different in that it involves the existence of an overall scheme and participation in it by the several defendants. There is evidence here which would have justified the jury in concluding that all of the defendants including Beeman embraced the total scheme with all of its ramifications. The jury was also at liberty to conclude that one or more of the defendants had not ratified or approved some transactions or some prior events
 
 
 [3]
 The full statement of the court is as follows:
 Now, we talk about "security". With reference to Count 5, I instruct you that the term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participating in any profit-sharing agreement, investment contract, or in general, any interest or instrument commonly known as a "security".
 And I instruct that if you find that there was a letter of commitment dated on or about December 2nd, 1965, signed by Darel D. Martin for the Lincoln Mortgage Company, Incorporated, that as a matter of law such a letter of commitment is a "security" within the meaning of the foregoing definition.
 
 
 [4]
 Merrill v. United States, 338 F.2d 763, 769 (5th Cir. 1964), wherein it was said:
 Each of the "securities" specified in Sec. 2311 consists of a single document which in itself is sufficient to establish a given right, relationship, or property interest.
 Similar views were expressed in United States v. Jones, 182 F.Supp. 146, 149 (W.D.Mo.1960). In that case it was said:
 [W]e think the term "evidence of indebtedness" has reference to some individual printed or written instrument for the transfer or payment of money, that contains on its face evidence of an obligation as to which some innocent person would act in relation to the terms thereof . . . .
 The Ninth Circuit quoted this language with approval in Barack v. United States, 317 F.2d 619 (9th Cir. 1963).
 
 
 [5]
 Mr. Justice Holmes wrote:
 * * * The facts were not in dispute, and what he did was to say so and to lay down the law applicable to them. In such a case obviously the function of the jury if they do their duty is little more than formal. The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found, and he can do the same none the less when the facts are agreed. If the facts are agreed the judge may state that fact also, and when there is no dispute he may say so although there has been no formal agreement. Perhaps there was a regrettable peremptoriness of tone-but the jury were allowed the technical right, if it can be called so, to decide against the law and the facts-and that is all there was left for them after the defendant and his witnesses took the stand. If the defendant suffered any wrong it was purely formal since, as we have said, on the facts admitted there was no doubt of his guilt. 254 U.S. at 138-139, 41 S.Ct. at 54. The Ninth Circuit has an approach not
 unlike that taken in Horning. See its opinion in Lyons v. United States, 325 F.2d 370 (9th Cir. 1963).
 
 
 [6]
 It was long ago held by the Supreme Court that the passage of the Securities Act, specifically 15 U.S.C. Sec. 77q, did not by implication repeal the mail fraud statute. Edwards v. United States, 312 U.S. 473, 483-484, 61 S.Ct. 669, 85 L.Ed. 957 (1941). The use of the mails is only incidental and jurisdictional to the securities offense, Little v. United States, 331 F.2d 287, 292 (8th Cir. 1964), whereas it is the gist of a Sec. 1341 offense. United States v. Blosser, 440 F.2d 697, 699 (10th Cir. 1971). This circuit has held that each mailing constitutes a separate offense under the mail fraud statute even though only one scheme is involved. Marvin v. United States, 279 F.2d 451, 454 (10th Cir. 1960); Milam v. United States, 322 F.2d 104, 109 (5th Cir. 1963). What is prohibited is the creation of several mail fraud crimes based on the mailing of a single letter. Marvin v. United States, supra, 279 F.2d at 453
 Likewise, the passage of Horwitz and the commitment fee in interstate commerce (18 U.S.C. Sec. 2314(2)), and the placing of a telephone call or telegram in pursuance of the fraud (18 U.S.C. Sec. 1343), constituted separate offenses.
 
 
 [1]
 We have compiled a list of corporate names utilized by the defendants, and the two deceased participants, Martin and Childs; it is not exhaustive, but indicates the great number of organizations among which the fund-seekers were shuffled by the defendants:
 Childs was directly
 involved in: Lincoln Mortgage and Prudential Corporation of America
 Bales Lincoln Mortgage and Prudential Corporation of America
 Martin Lincoln Mortgage and Prudential Corporation of America
 The above three also were involved in unauthorized use of the name of the Foundation Life Insurance Corp. of Atlanta, Georgia.
 Austin Lincoln Investment Co.; World Funding Corp.; Lincoln Mortgage Co.
 (held no formal office therein, but was described in much testimony
 as being involved with the corporation)
 Savidge Savidge and Associates; American Finding (or Funding) Corporation;
 Premium Finance Corporation; First National Financial Corp.
 Beeman Executive Title and Investment (or Trust) Company; Western Title
 Insurance Co.