577 F.2d 556
 Fed. Sec. L. Rep. P 96,516
UNITED STATES of America, Plaintiff-Appellee,
v.
David M. CARMAN, Defendant-Appellant.
 No. 77-1845.
 United States Court of Appeals,
Ninth Circuit.
 June 23, 1978.
 
 Harland W. Braun (argued), Los Angeles, Cal., for defendant-appellant.
 David R. Hinden, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.
 Appeal From the United States District Court for the Central District of California.
 Before TUTTLE,* GOODWIN and SNEED, Circuit Judges.
 SNEED, Circuit Judge.
 
 
 1
 David M. Carman was convicted after a 13-day jury trial of bribery, 18 U.S.C. § 201(b);[1] conspiracy, 18 U.S.C. § 371;[2] interstate transportation of money taken by fraud, 18 U.S.C. § 2314;[3] and four counts of securities fraud under the Securities Act of 1933, 15 U.S.C. § 77q(a) and § 77x.[4] He was sentenced to two years imprisonment and a fine of $2,000 for conspiracy, a fine of $5,000 for bribery, a fine of $1,000 for each count of securities fraud, and a fine of $1,000 for interstate transportation of money taken by fraud.
 
 
 2
 Carman appeals from the convictions, advancing four arguments: (1) he was denied a fair trial because the exculpatory testimony of a codefendant was suppressed by the government's refusal to grant immunity to the codefendant; (2) the transactions underlying the securities fraud charges are not "investment contracts" and are therefore not securities within the meaning of the Securities Act of 1933 ("the Act"); (3) the grand jury's indictment and the trial court's jury instruction regarding the interstate transportation of money taken by fraud embraced acts not within the reach of 18 U.S.C. § 2314; (4) the conspiracy conviction should be set aside in the event any substantive count conviction is overturned.
 
 
 3
 We find no error in the proceedings below with respect to the first two issues. However, we agree with Carman that the interstate transportation of money taken by fraud conviction should be overturned and that this reversal requires overturning the conspiracy conviction also. Therefore, we affirm in part and reverse in part.
 
 I.
 
 4
 Facts.
 
 
 5
 David Carman was a co-owner and Vice President of Automation Institute (AI) which owned six vocational training schools in California doing business as West Coast Trade Schools.
 
 
 6
 Operating funds for these schools were derived almost exclusively from two sources: direct federal grants provided to schools under the Campus Based Aid Program; and the sale of packages of Federally Insured Student Loans (FISL) to various financial institutions.
 
 
 7
 Campus Based Aid encompasses four programs (National Direct Student Loan Program, College Work Study Program, Basic Educational Opportunity Grant Program, and Supplemental Educational Opportunity Grant Program), all of which provide federal funds directly to schools as trustees for students. Local administration of the program is handled by the Division of Student Assistance of the Office of Education in San Francisco. Subpanels within the Division of Student Assistance review applications for grants and make recommendations as to the amounts to be awarded to each applicant.
 
 
 8
 In the period during which West Coast Schools applied for and received these grants, the Division of Student Assistance was headed by James Hoffe. Hoffe also presided over one of the subpanels. In October 1972 Hoffe was approached by Carman, O. A. Dameron (a former vice president of AI), and William F. Peters (president of AI). Peters asked Hoffe if he would be willing to "guide" West Coast Schools' applications through the subpanels so that they would receive the most favorable treatment possible. Peters also informed Hoffe of a consulting service contemplated by Group II Equities (a corporation owned by Carman, Peters and Fred P. Fisher, another co-owner of AI), through which applications would be prepared and submitted on behalf of other schools. In return for his services, Hoffe was to receive $1,000 per month and a portion of the profits earned by Group II Equities. Hoffe agreed to this arrangement. The agreement was finalized a few days later in a meeting attended by Carman, Hoffe, Peters, Dameron, and Fisher.
 
 
 9
 Pursuant to this arrangement, Hoffe drafted grant applications for West Coast Schools and had those applications diverted to the subpanel over which he presided, ensuring favorable recommendations on the grants requested. It is this activity which formed the factual basis for the bribery charge and one object of the conspiracy charge.
 
 
 10
 In addition to grants from Campus Based Aid, West Coast Schools also raised operating funds by obtaining promissory notes from students (in return for furnishing educational expenses), applying for federal insurance on the repayment of those notes, and then selling packages of the Federally Insured Student Loans at full face value to financial institutions. West Coast Schools' continued participation in the FISL program was dependent upon its receiving accreditation from the National Association of Trade and Technical Schools (NATTS), an agency of HEW. In October 1972 West Coast Schools was informed that failure to obtain accreditation by February 1973 would terminate its eligibility for the FISL program. Accreditation was being withheld primarily because of the precarious financial position of West Coast Schools. Many students had dropped out of school and were thereby entitled to a reduction in the principal amount of their promissory note. Because the notes had been sold at full face value, West Coast Schools was obligated to refund the difference to purchasers of the notes. At that time, West Coast Schools' refund liability was in excess of $500,000.
 
 
 11
 Accreditation was denied in January 1973 and, pending appeal, a $300,000 limit was placed on the FISL loan commitment to West Coast Schools. Despite this limitation, West Coast Schools obtained over $600,000 in FISL notes between January and April of 1973. In April accreditation was again formally denied and the over-extension of FISL guarantees was discovered. On May 1, 1973, the schools' FISL eligibility was formally suspended, and West Coast Schools ceased operations on May 24, 1973.
 
 
 12
 Despite the financial pressure of its refund liability and the uncertainty concerning its future participation in the FISL program, West Coast Schools continued to sell almost $1,000,000 in FISL packages to several credit unions between February and May of 1973. In addition to FISL notes, the "packages" included the following features: a contract under which Group II Equities would service the FISL paper (bill the government for monthly interest while the students were in school, and then bill graduated students for principal and interest); an agreement that West Coast Schools would repurchase any FISL notes that went into default; and a further agreement that West Coast Schools would buy back blocks of notes from the purchasers if given reasonable notice.
 
 
 13
 These features were consistent with the credit unions' investment objective of obtaining a high return on short-term, liquid transactions. However, at the time they purchased the FISL packages, the credit unions were not informed of West Coast Schools' precarious financial position, nor of its accreditation problems and the imminent suspension of FISL eligibility. Both factors materially affected West Coast Schools' ability to honor its repurchase agreements, and it is this failure to disclose material facts which forms the basis of the securities fraud charges.
 
 
 14
 Two days before West Coast Schools ceased operations, Carman, Peters and Fisher withdrew $290,000 from a Group II Equities account. The funds represented proceeds of a FISL package sold on May 8, 1973 (a transaction underlying one count of the securities fraud charges). In order to insulate these funds from attachment by creditors, approximately $280,000 of the withdrawal was transported to Arizona, converted to cashier's checks, then laundered through various accounts in California, Arizona, and Washington, D. C., giving rise to the charge of interstate transportation of money taken by fraud.
 
 
 15
 On October 15, 1976, Carman, Hoffe, Dameron, Fisher and Peters were indicted for conspiracy and bribery; Carman, Fisher, and Peters were also indicted for securities fraud and interstate transportation of fraudulently obtained money.[5]II.
 
 
 16
 Was Exculpatory Evidence Suppressed At Carman's Trial?
 
 
 17
 As stated above, Carman and Hoffe were both charged with conspiracy and bribery. Prior to trial, the government entered into a plea agreement with Hoffe. Hoffe pled guilty to conspiracy to commit a conflict of interest and the government agreed to dismiss the bribery count at the time of sentencing.
 
 
 18
 Claiming that Hoffe would give exculpatory testimony if allowed to testify without threat of prosecution, Carman moved the court to reject Hoffe's plea unless it was conditioned on Hoffe's full and honest testimony at Carman's trial. The motion was denied and Carman now claims that the denial, coupled with the government's refusal to grant immunity to Hoffe, constituted a deliberate suppression of exculpatory evidence and a denial of due process.
 
 
 19
 A defendant has no absolute right to elicit testimony from any witness, codefendant or not, whom he may desire. United States v. Gay, 567 F.2d 916, 919 (9th Cir. 1978). Furthermore, the government cannot be compelled to grant immunity to any prospective defense witness. United States v. Bautista, 509 F.2d 675 (9th Cir.), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); Cerda v. United States, 488 F.2d 720 (9th Cir. 1973); United States v. Jenkins, 470 F.2d 1061 (9th Cir. 1972), cert. denied, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973). Although Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967), suggested that due process might be violated where the government immunizes its own witnesses but refuses to immunize defense witnesses, the key issue in the due process analysis remains whether or not the defendant was denied a fair trial. See United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir.), cert. denied, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).
 
 
 20
 In Alessio, supra, this court held that the government's refusal to grant immunity to proposed defense witnesses, coupled with its grant of immunity to its own witnesses, did not deny the defendant a fair trial because the testimony that would have been elicited from the proposed witnesses had already been presented to the jury through the testimony of others. Therefore, the defendant was unable to demonstrate any prejudice to his defense resulting from the refusal to grant immunity.
 
 
 21
 We reach the same conclusion in this case. Even though the government did grant immunity to two of its own witnesses, Carman cannot claim that the refusal to grant immunity to Hoffe prejudiced his trial when he failed to call Hoffe to the stand to establish any need for immunity. His argument is based purely on speculation as to what Hoffe would do if called to the stand. When Carman's attorney objected to Hoffe's plea and indicated his belief that Hoffe would take the Fifth Amendment if called to the stand, Hoffe's attorney responded as follows:
 
 
 22
 . . . Mr. Hoffe is available, as he is to any other party, and will be during the course of the trial if they wish to call him. What he will do at that time is solely between myself and my client, and we will just have to await the ultimate conclusion to that, if and when he is called as a witness. (Reporter's Transcript, pp. 17-18).
 
 
 23
 Without calling Hoffe to the stand, neither Carman nor anyone else could be certain that Hoffe would assert his right against self-incrimination. Having failed to first establish a need for immunity, Carman's charge that the denial of immunity resulted in a suppression of evidence is not substantiated. In the absence of a showing that evidence favorable to him was actually suppressed, Carman has failed to show a resultant denial of due process as articulated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See also United States v. Hoyos, 573 F.2d 1111 (9th Cir. 1978).
 
 III.
 
 24
 Were the FISL Packages "Investment Contracts" Within the
 
 
 25
 Meaning of the Securities Act?
 
 
 26
 Upon instruction from the trial judge as to the definition of a security, the jury found that West Coast Schools' sale of FISL packages was a sale of securities within the meaning of the Act. The Act defines a security as "any note, . . . evidence of indebtedness, . . . (or) investment contract . . . ." 15 U.S.C. § 77b(1).
 
 
 27
 Carman argues that the court's instruction focused on the "investment contract" element of the definition and that the transactions at issue are not, as a matter of law, investment contracts. The government argues that the transactions are investment contracts, and that this court should not disturb the jury's finding unless the record provides no evidence from which the jury could rationally draw such a conclusion.[6]
 
 
 28
 A. The Standard of Review.
 
 
 29
 Although characterization of a transaction raises questions of both law and fact, the ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law. Ahrens v. American-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970).[7] Several decisions of this court have freely and extensively discussed the facts relevant to an investment contract in civil actions for violation of the Act.[8] However, in a criminal prosecution where the jury's verdict necessarily incorporates a determination as to whether or not "securities" were involved, the reviewability of that determination is a more complex question.
 
 
 30
 Other circuits have recognized this distinction and have gone so far as to reverse a trial court for not submitting the issue of the existence of an investment contract to the jury. Roe v. United States, 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). The Tenth Circuit held that it was reversible error to allow the jury to determine whether or not an investment contract existed in a civil case, Ahrens, supra, but considered it reversible error not to submit that same issue to a jury in a criminal prosecution. United States v. Austin, 462 F.2d 724, 736 (10th Cir.), cert. denied, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972).
 
 
 31
 This circuit has not precisely addressed the distinction. However, criminal convictions under the Securities Acts have generally been reviewed only for sufficiency of the evidence to support the jury's verdict. See generally, United States v. Livengood, 427 F.2d 420, 424 (9th Cir. 1970); Carroll v. United States, 326 F.2d 72, 75 (9th Cir. 1963).
 
 
 32
 In Farrell v. United States, 321 F.2d 409 (9th Cir.), cert. denied, 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1963), we quoted at length the jury instructions given on the definition of a security, which incorporated the definition contained in the Act supplemented by guidelines relating to investment contracts. Although this particular portion of the instruction was not challenged on appeal, the court stated that it found no error in any of the instructions; the jury was properly instructed on the applicable law and its verdict was to be sustained so long as there was "substantial evidence when viewed in the light most favorable to support the judgment." Id. at 414.
 
 
 33
 The trial court's instructions in this case parallel those given in Farrell, supra. The statutory definition of a security was supplemented with the definition of an investment contract given in terms of the controlling test set forth by the Supreme Court in SEC v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Finding that the court's statement of the applicable law was correct and complete, our review becomes limited to the sufficiency of the evidence to support the jury's verdict. This approach recognizes the question of law involved and the necessity for accurate instructions on that law, while treating the jury's verdict with appropriate deference.
 
 
 34
 B. The FISL Packages as Investment Contracts.
 
 
 35
 An investment contract is a scheme involving an "investment of money in a common enterprise with profits to come solely from the efforts of others." SEC v. W. J. Howey Co., supra, 328 U.S. at 301, 66 S.Ct. at 1104. "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." SEC v. Glenn W. Turner Enterprises, Inc.,474 F.2d 476, 482 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).
 
 
 36
 Carman contends that the sales involved do not satisfy the test set out in Howey, supra, nor the definition of a common enterprise. He argues that the profits expected by investors were in no way dependent upon the efforts of West Coast Schools because the return was in the form of fixed interest, guaranteed by the federal government.
 
 
 37
 This argument ignores not only the service contract, which placed investors in a totally passive role with respect to collecting on the notes, but also two potential risks to investors: (1) the federal guarantee was conditioned on West Coast Schools' "care and diligence" in making and collecting on the notes; and (2) the reduction on notes of students who dropped out of school resulted in a direct refund liability on the part of West Coast Schools. Avoidance of loss on either ground was clearly dependent upon the sound management and continued solvency of West Coast Schools. This risk of loss is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed.[9] See El Khadem v. Equity Securities Corp., 494 F.2d 1224, 1229 (9th Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).
 
 
 38
 The transactions before us involved more than just the sale of FISL paper; West Coast Schools sold an investment "package," including a service contract and repurchase agreements. The combination created "an integrated investment package which must be viewed in its entirety in determining whether it is within or without the Act." Safeway Portland Employees' Federal Credit Union v. Wagner & Co., Inc., 501 F.2d 1120, 1123 (9th Cir. 1974).
 
 
 39
 The Safeway Credit Union case involved an action against Wagner Co., a securities broker-dealer, for the sale of unregistered investment packages. The packages consisted of bank-issued Certificates of Deposit bearing 71/2 percent interest, plus a bonus on maturity of an additional 5/8 percent interest, to be paid by Wagner Co. The purchasing credit union relied on Wagner Co. to obtain the CDs and to complete the transaction whereby the credit union would receive its bonus. Actual payment of the bonus, a liability of Wagner Co., was clearly dependent upon the continued success and solvency of Wagner Co. On those facts, we held that the package was an investment contract within the meaning of the Act. The facts currently before us warrant the same conclusion.
 
 
 40
 West Coast Schools consistently promoted the package it offered as an investment, emphasizing the protection provided by the federal guarantee and bolstered by West Coast Schools' repurchase agreement, the liquidity provided by the buy-back agreement and the convenience of the service agreement. Officers of the credit unions testified that, without these economic inducements, they would have rejected the investment offer.
 
 
 41
 Mindful that the purpose of the Securities Act is to compel full and fair disclosure in the issuance of securities so that investors will be adequately protected, Howey, supra, 328 U.S. at 299, 66 S.Ct. 1100, we conclude that the evidence presented to the jury fully supports the finding that the investment packages sold by West Coast Schools were investment contracts within the meaning of the Act. Where an integrated investment package satisfies the test set forth in Howey, supra, and places inadequately informed investors in a position of potential jeopardy, invocation of the protection and penalties of the Securities Act is justified.
 
 IV.
 
 42
 Was Carman Properly Convicted Under 18 U.S.C. § 2314?
 
 
 43
 Count twelve[10] of the indictment charged Carman with the interstate transportation of $278,000 obtained from the sale of a FISL package, knowing the money to have been taken by fraud. It stated:
 
 
 44
 1. The Grand Jury hereby realleges and incorporates by reference the allegations set forth in paragraphs one through four, eight through eleven and fifteen through seventeen of Count I of the Indictment as though fully set forth herein.
 
 
 45
 2. Between on or about May 22, 1973 and on or about June 11, 1973 the defendants WILLIAM FRED PETERS, FRANKLIN PETER FISHER AND DAVID MANSFIELD CARMAN transported $278,000 in cash from the Central District of California to Phoenix, Arizona, knowing the said $278,000 to have been converted and taken by a fraud upon the creditors of Automation Institute. (C.T.Vol. 1-A, p. 30).
 
 
 46
 With respect to this charge, the court instructed the jury that two elements had to be proved in order to establish the offense:
 
 
 47
 First: That the accused transported or caused to be transported $278,000 from Los Angeles, California to Phoenix, Arizona; and
 
 
 48
 Second: That the accused transported the money from Los Angeles to Phoenix knowing it to have been converted or taken by fraud from the creditors of Automation Institute. (R.T. 1787).
 
 
 49
 Carman challenges his conviction on this count, contending that money placed out of the reach of creditors is not the equivalent of money "stolen, converted or taken by fraud" within the meaning of the statute and that the grand jury's charge and the trial court's instructions to this effect were improper.
 
 
 50
 We agree. No case has been cited to us which so extends the reach of 18 U.S.C. § 2314. Whether the matter be approached from the standpoint of fixing the limits of the words "stolen," "converted," or "taken by fraud," one encounters the requirement that the "stealing," "conversion," or "taking" must be from one having the attributes of an owner. Thus, the Supreme Court in United States v. Turley, 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430 (1957) defined "stolen" for the purposes of the Dyer Act (18 U.S.C. § 2312) to include "all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." (Italics added). Similarly, in Morissette v. United States, 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952) the Court interpreted "conversion" for the purposes of 18 U.S.C. § 641 in a manner designed to eliminate the "fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property." (Italics added). Even United States v. Allard, 458 F.2d 1136, 1139 (3d Cir. 1972), upon which the government here relies heavily, recognized that "taking by fraud" for the purposes of 18 U.S.C. § 2314 consists of the culmination of a plan "to despoil" the owner of his property. Accord, United States v. Handler, 142 F.2d 351, 353 (2d Cir.), cert. denied, 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594 (1944).
 
 
 51
 United States v. Roselli, 432 F.2d 879, 891 (9th Cir.), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1970) is not to the contrary. Its holding that commission of the crimes embraced by 18 U.S.C. § 1952 and 18 U.S.C. § 2314 did not require the knowing use of interstate facilities cannot reasonably be stretched to justify extending 18 U.S.C. § 2314 to embrace every fraudulent scheme which, however remotely, diminishes another's wealth. Roselli's suggestion that the essence of the crime set forth in 18 U.S.C. § 2314 is "the fraudulent scheme itself" must be read in the context of its holding with respect to the knowing use of interstate facilities. To do otherwise would be to make criminal, on the basis of a contextually uprooted aphorism, a debtor's fraudulent concealment of his own shrinking assets from the nervous scrutiny of his general creditors. Our refusal to construe 18 U.S.C. § 2314 so as to make criminal this form of commercial dishonesty is consistent with the maxim that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). We agree with the Court of Appeals of the Fifth Circuit that 18 U.S.C. § 2314 "should not be expanded at the government's will beyond the connotation depriving an owner of its rights in property conventionally called to mind." United States v. McClain, 545 F.2d 988, 1002 (5th Cir. 1977). The bristling specificity of 18 U.S.C. § 152, which, inter alia, makes concealment of assets in contemplation of bankruptcy a crime, strongly suggests this modest and restrained interpretation.
 
 
 52
 Finally, we have considered and now reject salvaging Count twelve by interpreting it to embrace the taking by fraud of money belonging to the purchasers of the FISL packages. Our careful review of the record convinces us that, while the prosecutor from time to time suggested that interpretation, both Count twelve and the jury instructions focused upon a taking from the creditors of Automation Institute. The prosecution's half-hearted alternative interpretation most likely was designed to provide a safety net in the event its expansive interpretation of 18 U.S.C. § 2314 failed. Fairness to the accused requires that the net also fail.V.
 
 
 53
 The Conspiracy Conviction.
 
 
 54
 Our reversal of appellant's conviction for interstate transportation of fraudulently obtained money requires that we consider his contention that this reversal also makes necessary a reversal of his conspiracy conviction. He points to the fact that the indictment's conspiracy count, Count one, charged the appellant with conspiring with others to commit each of the crimes with which he was charged under the substantive counts, and that the jury's verdict of guilty with respect to the conspiracy count was general. Under these circumstances, the appellant argues, it is not possible to know which crime the jury found he conspired with others to commit inasmuch as the jury was charged that a conspiracy with respect to any one was sufficient to enable the jury to convict under Count one. This being the case, the appellant continues, overturning the conviction with respect to any substantive count on the ground that it failed to state a crime compels overturning the conspiracy conviction because the jury might have concluded that conviction for conspiracy was proper only because of the appellant's participation in a conspiracy with respect to the substantive offense, the conviction for which was overturned. The appellant asserts that this possibility demolished the entire conspiracy conviction.
 
 
 55
 We agree. The authorities are divided on this issue. We held en banc some years ago that a "judgment must be and is reversed because it rests upon a general verdict which may have been found upon the jury's conclusion that a conspiracy existed to violate any one, any two, or all three United States laws, set up in one count, one of which was erroneously defined to the jury, and such erroneously defined law was so closely connected with both of the other laws in the alleged conspiracy as to affect the decision upon them to the reversible prejudice of all defendant-appellants." Samuel v. United States, 169 F.2d 787, 798 (9th Cir. 1948). This holding rested largely on Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931) in which the Supreme Court held that there should be set aside a general verdict of guilty rendered pursuant to an indictment charging in a single count several crimes, one of which was pursuant to an unconstitutional provision of a criminal statute, when the jury was charged that its "verdict might be given with respect to any one (crime), independently considered." The Supreme Court observed that under these circumstances "it is impossible to say under which clause of the statute the conviction was obtained." Ibid. These decisions we believe compel the result we have reached.
 
 
 56
 Nonetheless, our research indicates that the Second and Sixth Circuits very likely would reach a different result. United States v. Dixon, 536 F.2d 1388, 1401-02 (2d Cir. 1976) (conspiracy conviction sustained although a substantive count failed to state a crime which the "hybrid" conspiracy count charged the defendant with having conspired to commit); United States v. Papadakis, 510 F.2d 287, 297 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975) (conspiracy conviction sustained when conspiracy count alleged "multiple objectives" one of which was assumed not to be a crime); Moss v. United States, 132 F.2d 875, 878 (6th Cir. 1943) (conspiracy conviction sustained when indictment charging multiple conspiracies treated on appeal as one conspiracy even though one of the objectives was not unlawful).[11] Seventh Circuit decisions appear in conflict. Thus, United States v. Tanner, 471 F.2d 128, 140 (7th Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972) (conspiracy conviction stands so long "as one of the objects of the conspiracy is unchallenged") appears in conflict with United States v. Baranski, 484 F.2d 556, 560-61 (7th Cir. 1973) (conspiracy conviction overturned when one of the objects of an indictment alleging a conspiracy to violate three criminal statutes was not wrongful because of unconstitutionality of the underlying statute and jury charged that conviction proper if "action taken to attain any of the alleged objects") despite the court's effort in Baranski to distinguish Tanner.
 
 
 57
 The Third Circuit, however, appears to support the result we reach. United States v. Tarnopol, 561 F.2d 466, 475 (3d Cir. 1977) (conspiracy conviction overturned when conspiracy count set forth multiple objectives and evidence not sufficient to establish conspiracy with respect to one such objective); United States v. Dansker, 537 F.2d 40, 51 (3d Cir. 1976) (conspiracy conviction overturned when conspiracy count set forth two objectives, jury instructed that a conspiracy with respect to either sufficient to convict, and evidence not sufficient to support conviction of the substantive crime to which one of the objects relates). So likewise does the Fifth Circuit. Van Liew v. United States, 321 U.S. 664, 672 (5th Cir. 1963) (conspiracy conviction overturned when portion of conspiracy count failed to set forth illegal objectives and guilty verdict was general).
 
 
 58
 Because of this division of authorities and the difficulty in determining in each cited case the structure of the conspiracy portion of the indictment, the content of the jury instructions pertaining to the conspiracy count or counts, and the nature of the jury's verdict, we think it necessary to set forth carefully both what we do not hold in this case as well as what we do so hold.
 
 
 59
 To begin with, nothing in our holding, or in this opinion, is intended to suggest that when a conspiracy count charges a conspiracy to commit several substantive crimes that it is invariably improper to charge, as did the trial court in this case, that the jury can return a verdict of guilty on the count if it finds that the conspiracy existed to commit any one of the substantive crimes. A verdict of guilty following such a one-is-enough charge assures that the prosecution established beyond a reasonable doubt that the defendant engaged in a conspiracy to violate at least one criminal statute. To which crime the conspiracy relates is irrelevant in the absence of additional complicating circumstances.
 
 
 60
 Nor does it become relevant when, again as happened in this case, the jury returns a verdict of guilty on a "composite" conspiracy count but not guilty on one or more of the substantive crimes set forth in the conspiracy count. Such verdicts are not inconsistent. Rather they indicate that the jury found the conspiracy related either to each substantive crime that it found the defendant had committed or to at least one, but less than all, such crimes. In either event the conspiracy conviction is immune from attack on appeal so long as no substantive count conviction is overturned because the count failed to state a crime. A determination that the conspiracy related to less than all the substantive crimes mentioned in the composite count can be the result of either an explicit decision by the jury or its failure to consider each such crime after determining that the conspiracy related to at least one.[12]
 
 
 61
 It is the possibility of this inattention on the part of the jury that produces difficulty when one of the substantive count convictions is overturned on appeal for failure to state a crime. If the jury, when considering the conspiracy count, focused only on the crime embodied in the subsequently overturned substantive crime conviction the conspiracy conviction also should be overturned. Of course, if it focused on other crimes as well, the conspiracy conviction should be sustained. The one-is-enough charge makes it impossible to know precisely what the jury considered. Not knowing, a reviewing court must overturn the conspiracy conviction. Criminal sanctions cannot rest on what an appellate court thinks the jury would have done had the issues put to it been framed differently.
 
 
 62
 At least three ways exist by which this result can be avoided. One is to forego the use of the one-is-enough charge. A conviction for conspiracy, following a charge that conviction under the composite conspiracy count is possible only if the defendant is found to have conspired to commit each and every crime included in the count obviously will survive the reversal of one of several substantive crime convictions. Survival also can be assured when the one-is-enough charge is employed by requiring the jury to render a special verdict with respect to each substantive crime the composite conspiracy count mentions. Such a requirement does not conflict with the one-is-enough charge; it merely requires the jury to consider each substantive crime and to reveal its conclusions. Finally, subject to the rule that a single conspiracy to violate several criminal statutes is but a single violation of the conspiracy statute,[13] the composite conspiracy count can be abandoned and the indictment drawn so as to indict separately with respect to each substantive crime the defendant is accused of conspiring to commit.
 
 
 63
 In essence, the difficulty this case presents springs from the combined effect of the composite conspiracy count, the one-is-enough jury charge, and the failure of one of the substantive crime counts to charge a crime. Eliminate in substance any one of these three and the specific holding of this case will not damage the conspiracy conviction.
 
 
 64
 Finally, we explicitly draw attention to the fact that our holding is dependent upon a reversal of a substantive crime conviction on the ground that the applicable count of the indictment failed to state a crime. We express no opinion on the propriety of reversing a conspiracy conviction when the reversal of a substantive crime conviction is based on a ground other than the failure of the substantive crime count to state a crime. Whether such other ground requires the result we reached here is not now before us. We should mention once more, however, that in Samuel v. United States, supra, the error consisted of an improper definition of the crime to which the conspiracy related.
 
 
 65
 Affirmed in part; Reversed in part.
 
 
 
 *
 Hon. Elbert Parr Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 18 U.S.C. § 201(b) "Whoever, directly or indirectly, corruptly gives, offers, or promises anything of value to any public official . . . with intent
 (1) to influence any official act;
 (e) Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both . . . ."
 
 
 [2]
 18 U.S.C. § 371 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined no more than $10,000 or imprisoned not more than five years, or both."
 
 
 [3]
 18 U.S.C. § 2314 "Whoever transports in interstate or foreign commerce any . . . securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both. . . ."
 
 
 [4]
 15 U.S.C. § 77q(a) "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."
 15 U.S.C. § 77x "Any person who wilfully violates any of the provisions of this subchapter . . . shall upon conviction be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [5]
 Prior to trial, Dameron pled guilty to the conspiracy count and Fisher pled guilty to aiding and abetting the commission of a conflict of interest (18 U.S.C. § 2 and § 208). These defendants were then severed from the trial of Carman and Peters. Peters was convicted on the same counts as Carman, but does not join in this appeal
 
 
 [6]
 Neither party has attempted to bring the FISL notes within the definition of a security by arguing that the notes are "notes" or "evidences of indebtedness" as contemplated by the Act. Because we hold that the packages are "investment contracts," we do not decide if the FISL notes, standing alone, would be notes or evidences of indebtedness within the meaning of the Act
 
 
 [7]
 Although this court has not specifically addressed itself to a standard of review, Great Western Bank & Trust v. Kotz, 532 F.2d 1252 (9th Cir. 1976) stated that whether one party has made an "investment" in return for another party's "security" is a question of law, but that in appropriate circumstances a properly instructed jury can determine if, as a matter of fact, a disputed instrument is or is not a security. Id. at 1255
 
 
 [8]
 See, e. g., El Khadem v. Equity Securities Corp., 494 F.2d 1224 (9th Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974); Safeway Portland Employees' Federal Credit Union v. Wagner & Co., Inc., 501 F.2d 1120 (9th Cir. 1974); SEC v. Glenn W. Turner Ent., Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); Los Angeles Trust Deed & Mortgage Exchange v. SEC, 285 F.2d 162 (9th Cir.), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961)
 
 
 [9]
 Both parties have referred to the "risk capital" test recently utilized by this court which analyzes a number of factors indicating the nature and degree of risk involved in a transaction to determine if an investment has been made in return for securities. See United California Bank v. THC Financial Corp., 557 F.2d 1351 (9th Cir. 1977); Great Western Bank & Trust v. Kotz, 532 F.2d 1252 (9th Cir. 1976)
 The test has been employed where the underlying question is whether the "investor" actually invested in a security, or in essence made a commercial loan. The parties herein do not contend that the credit unions' purchase of the FISL packages was actually a loan to West Coast Schools; in fact, federal credit unions are prohibited by law from making loans to anyone other than members. Accordingly, explicit discussion of the risk capital test is not necessary for our analysis.
 
 
 [10]
 The indictment originally charged twelve counts. At the close of the trial, the government moved to dismiss three counts. This motion was granted, and the indictment was read to the jury in nine counts. References herein correspond to the number of the count as it appeared in the original indictment
 
 
 [11]
 It is arguable that this case presents the equivalent of special verdicts where there was a composite conspiracy count and a one-is-enough jury charge. If so, it is not contrary to our holding in this case. See p. 568, infra
 
 
 [12]
 It is also possible for a conspiracy conviction to stand even when the defendant has been acquitted on all substantive counts. The crime of conspiracy is a separate and distinct offense; it is established upon an agreement to engage in criminal activity accompanied by an overt act, which need not be unlawful, committed in furtherance of that agreement. United States v. Monroe, 552 F.2d 860, 862 (9th Cir.), cert. denied, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069 (1977); United States v. Thompson, 493 F.2d 305, 310 (9th Cir.), cert. denied, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Completion of the objective is not an element of conspiracy and, therefore, acquittal on a substantive count does not preclude conviction on a conspiracy count with the substantive offense as its object. United States v. Miller, 546 F.2d 320, 325 (9th Cir. 1976); Shayne v. United States, 255 F.2d 739, 745 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 39, 3 L.Ed.2d 64 (1958); Coy v. United States, 5 F.2d 309, 310 (9th Cir. 1925)
 
 
 [13]
 See, Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); United States v. Campanale, 518 F.2d 352, 357-58 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); United States v. Noah, 475 F.2d 688, 693 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973)