**FEDERAL SAVINGS & LOAN INSURANCE CORPORATION, as Sole Receiver for Homestead Savings & Loan, Plaintiff,**

v.

**PROVO EXCELSIOR LIMITED, et al., Defendants.**

v.

**FINANCIAL MANAGEMENT SERVICES, INC., et al., Third Party Defendants.**

Civ. No. C86–0423G.

United States District Court, D. Utah, C.D.

April 24, 1987.

---

James W. Stewart, Dixon F. Larkin, William C. Gibbs, Edward Munson, Salt Lake City, Utah, and James Igo, for plaintiff.

Paul A. Grana, James W. Erwin, Roman Wuller, St. Louis, Mo., Richard L. King, Stephen C. Stoker, A. Robert Thorup, Salt Lake City, Utah, Gary L. Gregerson, Provo, Utah, Joseph T. Dunbeck and Randy Dryer, Salt Lake City, Utah, for defendants.

J. THOMAS GREENE, District Judge.

This court heard oral argument on all pending motions on February 5, 1987. Homestead Savings and Loan and the Federal Savings and Loan Insurance Corp. ("FSLIC") were represented by James W. Stewart, Dixon F. Larkin, William C. Gibbs, Edward Munson and James Igo. Defendants Heitner Corporation, Norman S. Heitner, Sr., Norman E. Heitner, Jr., Daniel J. Ferry, and Annalee D. Moenster (collective-

ly referred to as "Heitner Defendants") were represented by Paul A. Grana. Defendant Mercantile Bank National Association ("Mercantile") was represented by James W. Erwin and Roman Wuller. Defendants The Marling Group, Ltd., Jules S. Marling, Jr. and Andrea S. Robson (collectively referred to as "Marling Defendants") were represented by Richard L. King. Defendants (and third party plaintiffs) Provo Excelsior Limited, Robert L. Schwartz, Henry R. Silverman and Adrian B. Werner (collectively referred to as "Provo Excelsior Parties") were represented by Stephen C. Stoker. Defendant the City of Provo, Utah was represented by Robert Thorup and Gary L. Gregerson. Third party defendants Northwest Federal Savings and Loan and David Houston (collectively referred to as the "Northwest Defendants"), United Federal Savings and Loan Association, Investors Federal Savings Bank, First Federal Savings and Loan Association of Shawnee, State Federal Savings and Loan Association, Great Plains Federal Savings and Loan Association and Lee White ("collectively referred to as Third Party Savings and Loan Defendants") were represented by Joseph T. Dunbeck. Third Party Defendants First Federal Savings and Loan Association of Chickasha, O.K. Federal Savings and Loan Association, Eugene Arwood, Earl Meyer, William L. Davis, James W. Wilkinson and Robert P. Bates were represented by Randy Dryer.

After oral argument the court ruled on several of the pending motions as evidenced by Order dated April 8, 1987, and took under advisement the following portions of the motions presented: (1) motions by Mercantile and the Marling Defendants to dismiss FSLIC's fifth claim for relief under § 12(2) of the Securities Act of 1933; (2) motions by Mercantile and the Marling Defendants to dismiss FSLIC's thirteenth claim for relief under Utah Code Ann. § 61–1–22 (1)(b) (1986); (3) motions by Mercantile, the Marling Defendants and the Provo Excelsior Parties to dismiss FSLIC's ninth claim for relief to the extent it seeks relief for aiding and abetting violations of § 12(2); (4) motion by Mercantile to dismiss FSLIC's second claim for relief dealing with foreclosure; (5) motion by Mercantile to dismiss FSLIC's twenty-first claim for relief dealing with breach of contract based upon guarantee agreements; (6) motion by FSLIC to dismiss the counterclaims of the Provo Excelsior Parties based upon lack of subject matter jurisdiction; and (7) motions by the Northwest Defendants and the Third Party Savings and Loan Defendants to dismiss the Provo Excelsior Parties' third party complaint for failure to state a claim and lack of personal jurisdiction. The court is now fully advised and enters its Memorandum Decision and Order.

## BACKGROUND

This case arises generally from the financing of the Provo Excelsior Hotel located in Provo, Utah. In November of 1981 Provo Excelsior, Ltd., a Utah limited partnership, was organized for the purpose of building and operating a hotel. In 1981 Provo Excelsior Ltd. obtained almost $12 million in financing with the major portion coming from a construction loan that was secured by a first mortgage on the hotel and a standby commitment issued by the Savings Investment Service Corporation ("SISCorp") for $10.5 million. SISCorp is an Oklahoma corporation which is owned by thirty-two savings and loan associations located in the State of Oklahoma. According to the by-laws of SISCorp, the members of its board of directors must be officers of the shareholder companies (savings and loan associations). Plaintiff Homestead Savings and Loan Association ("Homestead") which is succeeded in interest by the FSLIC, was a shareholder in SISCorp and Homestead's president, Darrel Deason, served on the board of directors of SIS-Corp. The Provo Excelsior Parties have alleged that the 1981 standby commitment was negotiated on the behalf of SISCorp by third party defendant Financial Management Services, Inc. ("FMS") which served as exclusive agent for SISCorp in originating loans outside of the State of Oklahoma. Third party defendant David Namer ("Namer") served as president and sole shareholder of FMS. The expiration of the 1981 standby commitment of SISCorp was extended twice, for consideration paid in cash, but it was determined later that alter-

native financing would be necessary once the construction of the hotel was complete.

In May 1983 the Provo Excelsior Hotel was complete. Thereafter, the Provo Excelsior Parties entered into loan agreements with the City of Provo, Utah. As part of the transaction the City of Provo on December 8, 1983, issued $10 million in Industrial Development Revenue Bonds Series 1983 A through a public offering to approximately one thousand investors, and $2 million in Industrial Development Revenue Bonds Series 1983 B through a private offering to Homestead. The interest on the bonds was to be paid by the City of Provo from the loan payments made by the Provo Excelsior Parties. The bonds were secured in three ways: (1) in consideration for the payment of $536,775, SISCorp entered into a standby commitment whereby it agreed to make a loan to the Provo Excelsior Parties in an amount sufficient to pay the outstanding principal of the Series A and Series B bonds in the event of default;[1] (2) both the Series A and Series B bonds were secured by separate leasehold deeds of trust and security agreements which provided that the liens of each deed of trust were to be of equal priority; (3) the partners of the Provo Excelsior, Ltd. gave personal guarantees for the benefit of the Series B bondholders.

On approximately July 7, 1985 the bonds went into default. FSLIC has alleged in its complaint that SISCorp never entered into binding contracts with participating financial institutions to secure the bond transaction and as a result the standby commitment was never honored.

## I. Who is a "Seller" Under § 12(2) of the 1933 Act—FSLIC's Fifth Claim for Relief

Section 12(2) of the 1933 Securities Act provides that

*Any person who—*

. . . . .

(2) Offers or sells a security ..., by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact ..., and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to *the person purchasing such security from him.*

. . . . .

15 U.S.C. § 77*l* (emphasis added). The remedy for the purchaser is return of the consideration paid or damages if the purchaser no longer owns the security. *Id.* Mercantile and the Marling defendants argue that § 12(2) imposes a strict privity requirement so that a purchaser may only sue the person who actually held title to the security and who contracted with the purchaser as the "offeror" or "seller" to sell the security. Indeed that interpretation is entirely consistent with the language of § 12(2) which states that "[a]ny person ... who offers or sells ... shall be liable to the person purchasing such security from him...." and with the remedy of rescission provided for in the statute. *Id.* However, various courts interpreting § 12(2) have recognized that other persons may substantially participate in the offer or sale of a security even though they do not have title to the security. As a result, courts have used concepts of participation and causation to "deem" those secondary parties to be "sellers" for purposes of § 12(2).[2] In addition, some courts have applied the concept of aiding and abetting

---

**1.** According to the Official Statement distributed to the public investors various participating financial institutions and savings and loan associations had binding contracts with SISCorp to fulfill the obligation undertaken by SISCorp. It is also alleged that Namer, and Bruce Wright ("Wright"), who was president of SISCorp, made representations to the Heitner defendants, defendant City of Provo and the Provo Excelsior Parties that binding "participation agreements" had in fact been signed by SISCorp and various financial institutions.

**2.** *See Davis v. Avco Financial Services,* 739 F.2d 1057, 1065–68 (6th Cir.1984); *Admiralty Fund v. Jones,* 677 F.2d 1289, 1294–95 (9th Cir.1982); *Junker v. Crory,* 650 F.2d 1349, 1360 (5th Cir. 1981); *Stokes v. Lokken,* 644 F.2d 779, 784–85 (8th Cir.1981); *Lawler v. Gilliam,* 569 F.2d 1283, 1287–88 (4th Cir.1978); *Katz v. Amos Treat &*

violations of § 12(2) to expand the coverage of § 12(2) liability to others who were not in strict privity with the purchaser.[3]

The issue raised by Mercantile and the Marling defendants requires that this court determine the scope of coverage regarding what persons are subjected to possible liability under § 12(2). The Tenth Circuit has not spoken on the issue and as a result this court must grapple with several possibilities. There are persuasive and important policies advanced by each side for a restrictive or expansive interpretation of the class of defendants under § 12(2). On the side of restrictive interpretation of § 12(2) is the statute itself which seems to impose a strict privity requirement. The Supreme Court in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (quoting *SEC v. Sloan*, 436 U.S. 103, 116, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978)) emphasized that "generalized references to the 'remedial purposes' of the [securities acts] will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.'" In *Touche Ross* the Supreme Court rejected as "entirely misplaced" application of tort principles to imply a private right of action under § 17(a) of the 1934 Act. *Id.* at 568, 99 S.Ct. at 2485. In addition, focusing upon the statutory scheme, Congress has expressly dealt with the issue of secondary parties by expanding the scope of § 12(2) to persons who are shown to have *controlled* a person who violates § 12(2). *See* 15 U.S.C. § 77o. Finally, the Supreme Court has recognized that § 10(b) of the 1934 Act is a "catchall" antifraud provision which applies to *"anyone"* connected with the purchase or sale of securities. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). As such, violation of that statute requires a demonstration of " 'scienter'—intent to deceive,

manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). However, § 12(2) allows for recovery based upon negligent conduct. As a result, it may be argued that an incongruity would result from an expansive and broad interpretation of § 12(2), thus undercutting the Supreme Court's interpretation that the "catchall" antifraud provision of 10(b) requires proof of scienter. *See* Comment, *Secondary Liability under Section 12(2) of the Securities Act of 1933*, 78 N.W.L. Rev. 832, 854–857 (1983).

Those courts that espouse a more expansive interpretation of the class of persons subject to § 12(2) liability rely on pronouncements by the Supreme Court that the remedial purposes of the securities laws cannot be ignored when interpreting the statutes. *See Davis v. Avco Financial Services, Inc.*, 739 F.2d 1057, 1064 (6th Cir.1984). In *Davis* the Sixth Circuit framed the policy issue as follows:

> In light of the fact that the consequence of denominating anyone a "seller" under § 12(2) is to force that person to bear the burden of persuasion in establishing his lack of negligence for representations made by him, what sort of involvement in the sale of a security should be required to justify such inclusion?

A majority of the Circuits have responded to the above policy question by recognizing that those who formally transfer title to a security are not the only persons who are so substantially involved with a sale that they *ought* to bear the burden of demonstrating their lack of negligence.[4]

With that background of the policies involved in interpreting the scope of § 12(2), the court turns to the three positions which have been taken by various courts as to the meaning of "seller." The most expansive

---

Co., 411 F.2d 1046, 1052–53 (2d Cir.1969) (adopting similar interpretation for § 12(1) liability).

**3.** *See Kilmartin v. H.C. Wainwright & Co.*, 580 F.Supp. 604, 608 (D.Mass.1984); *Hill v. Equitable Bank, Nat'l Ass'n*, 599 F.Supp. 1062, 1083 (D.Del.1984); *Klein v. Computer Devices, Inc.*,

591 F.Supp. 270, 276 (S.D.N.Y.1984); *Frankel v. Wyllie & Thornill, Inc.*, 537 F.Supp. 730, 744 (W.D.Va.1982); *deBruin v. Andromeda Broadcasting Systems, Inc.*, 465 F.Supp. 1276, 1280 (D.Nev.1979).

**4.** *See* cases cited *supra* note 1.

position appears to be that of the Sixth Circuit:

> [T]he line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow *directly* and *proximately* from the actions of this particular defendant?
>
> . . . . .
>
> "In assessing proximate cause, courts focus first on whether a defendant's acts were the *actual cause* of the injury, i.e., whether 'but for' the defendant's conduct, there would have been no sale.... Before a person's acts can be considered the proximate cause of a sale, his acts must also be a substantial factor in bringing about the transaction.... Thus, defendant will be held liable as a participant under § 12(2) if his acts *were both necessary to and a substantial factor in the sales transaction.*"

*Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057, 1066–67 (6th Cir.1984) (quoting *S.E.C. v. Murphy,* 626 F.2d 633, 650 (9th Cir.1980)).

A middle ground was advanced by the court in *In re Activision Securities Litigation,* 621 F.Supp. 415 (N.D.Cal.1985). In *Activision* the court held that "seller status [has] to be predicated on actual participation in the selling process." *Id.* at 521 (quoting *Hudson v. Capital Management International, Inc.,* 1983–84 Fed.Sec.L. Rep. (CCH) ¶ 99,222 at 95,904 (N.D.Cal. 1982)). In that case the defendants had "helped draft the Prospectus, participated in 'road show' presentations of information to securities brokers and investment analysts, analyzed the market and set the price for Activision shares, and negotiated the agreement with the underwriters." *Id.* In dismissing the 12(2) claim the court distinguished the above activities from other cases where a defendant had met personal-ly with investors and had spoken at broker-dealer seminars.[5]

The third and most restrictive view of "seller" for purposes of § 12(2) is that of the Third Circuit which limits recovery by "a purchaser to [a] claim against his immediate seller." *Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3rd Cir.1979).

In applying any one of the three positions to the facts of a particular case, it is important to be aware of the reality that recognition of a cause of action for aiding and abetting a § 12(2) violation will expand the class of persons subject to possible liability. As a result, there are really six possible alternatives with regard to § 12(2) liability, depending on whether aiding and abetting is or is not combined with one of the three alternatives for determining "seller" status. This court adopts the middle ground for definition of "seller" and recognizes a cause of action for aiding and abetting § 12(2). Accordingly, we rule that "seller" status for § 12(2) will exist as to the person who transfers title to the stock and such additional persons who actually and directly participate in soliciting a plaintiff's purchase to the extent that they are a substantial factor in the actual offer or sale to that plaintiff. In addition, persons who aid and abet sellers in violation of § 12(2) will be subject to liability. The rationale for adoption of these views is that while "seller" is expanded to include more persons than the immediate persons who formally transfer title, the class of persons subjected to liability is not expanded to the point of completing an end run around the "scienter" requirement of Rule 10(b) because aiding and abetting requires proof of knowledge of the primary wrong. *See Dahl v. Gardner,* 583 F.Supp. 1262, 1267 (D. Utah 1984).

---

**5.** *See also In re Wicat Securities Litigation,* 600 F.Supp. 1236 (D.Utah 1984). In *Wicat* Judge Winder of this court adopted a test said to be in the middle of the spectrum: "Some direct participation in the sale between underwriter and buyer must be alleged in order to state a § 12(2) claim. Other than this narrow holding, this court will not attempt to plumb the depths of the 'substantial factor' standard of liability." *Id.* at 1242. Judge Winder recognized that the concepts of "control, agency, or direct participation in the sale ..." are available to extend § 12(2) to a class of persons beyond those in direct privity, leaving open possible expansion of those concepts in future cases. *Id.* at 1240.

### A. *Mercantile's Motion*

■ Mercantile served as trustee for the Series A and Series B bonds. The allegations concerning Mercantile's role as a "seller" are that it participated in drafting and reviewing documents necessary for the Series B issue, including the package of documentation received by Homestead. FSLIC has pointed specifically to allegedly misleading statements made in the Official Statement regarding Mercantile's role as trustee. Under the rule adopted by this court, those allegations fail to state a claim for relief under § 12(2). *See In re Activision Securities Litigation,* 621 F.Supp. 415, 421 (N.D.Cal.1985) (assistance in drafting prospectus insufficient); *In re Wicat Securities Litigation,* 600 F.Supp. 1236, 1240–41 (D. Utah) (participation in preparation of prospectus insufficient). The fact that Mercantile was a necessary party to complete the transaction is insufficient. There is no allegation that Mercantile in any way directly participated in soliciting Homestead's purchase of the Series B bonds. Accordingly, Mercantile's motion to dismiss the FSLIC's fifth claim for relief is granted.

### B. *The Marling Defendant's Motion*

■ The Marling defendants were engaged by the Provo Excelsior Parties to do a market and feasibility analysis with respect to the Provo Excelsior Hotel. FSLIC has alleged that the Marling defendants knew that Homestead intended to use the analysis to obtain financing. FSLIC further alleges that the analysis contained numerous material misrepresentations and omissions upon which Homestead relied in purchasing the Series B bonds. However, the fact that Homestead placed great reliance on the analysis prepared by the Marling defendants does not amount to direct solicitation by the Marling defendants of Homestead's purchase of the bonds. There is no allegation that the Marling defendants had an equity or other interest in the financing. Essentially, the Marling defendants provided an arm's length professional service to the Provo Excelsior Parties. The fact that Homestead relied on the quality of that service does not bridge the gap so as to make the Marling defendants direct solicitors of Homestead's purchase. Accordingly, the Marling defendant's motion to dismiss the FSLIC's fifth claim for relief is granted.

### II. *Seller Status Under the Counterpart Utah Law: § 61–1–22(1)(b) of the Utah Uniform Securities Act—FSLIC's Thirteenth Claim for Relief*

■ Section 22(1)(b) of the Utah Uniform Securities Act provides that

*Any person who:*

. . . . .

(b) Offers, sells, or purchases a security by means of any untrue statement of a material factor or any omission to state a material fact ..., and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to *the person selling the security to or buying the security from him....*

Utah Code Ann. § 61–1–22(1)(b) (1986). The remedy under Section 22(1)(b) is return of the consideration paid or damages if the purchaser no longer owns the security. Thus, § 22(1)(b), like its federal counterpart § 12(2), appears to impose a strict privity requirement. However, consistent with this court's holding regarding the federal statute, § 22(1)(b) is interpreted to include within the class of persons potentially liable only those persons who actually and directly participate in soliciting a plaintiff's purchase to the extent that they are a substantial factor in the actual offer or sale. Under the analysis of this court, Mercantile and the Marling defendants do not come within the parameters of that test and accordingly their respective motions to dismiss the FSLIC's thirteenth claim for relief are granted.

### III. *Aiding and Abetting Violations of § 12(2) of the 1933 Act—FSLIC's Ninth Claim for Relief*

■ Mercantile, the Marling defendants, and the Provo Excelsior Parties have brought motions to dismiss that portion of

FSLIC's thirteenth claim for relief that seeks recovery for aiding and abetting primary violations of § 12(2). Aiding and abetting requires proof of "(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong." *Dahl v. Gardner*, 583 F.Supp. 1262, 1267 (D.Utah 1984) (quoting *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.); *cert. denied*, 469 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1982)). As previously discussed, this court recognizes a cause of action for aiding and abetting a primary violation of § 12(2) under the interpretation of "seller" here adopted. Accordingly, defendants' motions to dismiss that portion of FSLIC's ninth claim for relief is denied.[6]

## IV. *Foreclosure—FSLIC's Second Claim for Relief*

█ Both the Series A and Series B bonds are secured by separate leasehold deeds of trust and security agreements covering the Provo Excelsior Hotel property. The Series B Agreement expressly provides that "[i]rrespective of the order of recording, both the Series B Deed of Trust and the Series A Deed of Trust shall equally secure the Series 1983 Bonds and the liens thereof shall be on a parity one with another." In this case no payments have been made to either the Series A or Series B bondholders since June 1, 1985.

On February 7, 1986, Mercantile filed suit in the United States District Court for the Eastern District of Missouri against Homestead and other savings and loan institutions that were the shareholders of SISCorp. In that lawsuit Mercantile alleges that Homestead as a shareholder of SISCorp and through its president, Darrell Deason, who served on the board of directors of SISCorp, participated in the fraud regarding the failure by SISCorp to obtain binding participation agreements to fulfill SISCorp's standby commitment. Mercantile has requested that the District Court in Missouri instruct Mercantile "with respect to how to proceed to protect and safeguard the conflicting interests of the Provo Series A and Series B bondholders...." Mercantile has also requested the court to cancel the Series B bondholders' security interest in the property or in the alternative to subordinate that interest to that of the Series A bondholders. On May 20, 1986 the complaint in this case was filed and Homestead (which is now succeeded by the FSLIC) has requested that this court determine that the Series B bondholders have a prior and superior lien to all defendants, including Mercantile as the trustee, and that Homestead be allowed to foreclose on the property.

Mercantile takes the position that FSLIC's claim must be dismissed because FSLIC represents the interests of only 16.7% of the outstanding bondholders which is insufficient to meet the condition precedent of 25% required by the express terms of the Indenture of Trust.[7] FSLIC

---

**6.** One court has concluded that if all the elements for aiding and abetting a violation of § 12(2) are proven the defendant would necessarily be liable for a primary violation under § 10(b) and therefore it is redundant to recognize the aiding and abetting claim. *Hackett v. Village Court Associates*, 602 F.Supp. 856, 859 (E.D.Wis.1985). Although that will be the case in many situations there may be factual situations where a primary violation of § 10(b) would not be present, and for that reason we consider that aiding and abetting § 12(2) claims should not be foreclosed.

**7.** The FSLIC's ability to foreclose on the property appears to be governed by Paragraph 9.03 of the Indenture of Trust which provides:

*Rights and Remedies of Bondholders.* No owner of any bond shall have any right to institute any suit, action or proceeding at law

or in equity for the enforcement of this Indenture or for the execution of any trust hereof ... unless (i) a Default has occurred of which Trustee has been notified ... or of which ... it is claimed to have notice, (ii) owners of not less than twenty-five percent (25%) in aggregate principal amount of Outstanding Bonds shall have made written request to Trustee ... and they have offered to Trustee indemnity as provided in Section 10.01(1), and (iii) Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in its own name within a reasonable time. Such notification, request and offer of indemnity are hereby declared in every case at the option of Trustee to be considered conditions precedent to the executions of the powers of trusts of this Indenture, and to any action or cause of action for the enforcement of this Indenture

argues that Mercantile as trustee has taken a position adverse to the Series B bondholders by trying to extinguish or subordinate their security interests in the United States District Court of Missouri. In this regard FSLIC relies on the case of *Weir v. Bauer*, 75 Utah 498, 286 P. 936, 943 (1930) wherein the Utah Supreme Court recognized that conditions precedent to foreclose such as those here may be waived when the trustee is not a proper party to represent the interests of the bondholders because of a conflicting interest or by reason of conduct prejudicial to the bondholder's rights.[8]

It is clear that the interests of Mercantile and FSLIC (Series B bondholders) are adverse and that both parties are attempting to invoke the jurisdiction of a federal district court to subordinate the interests of the other in the land and/or the proceeds from sale.[9] Both parties effectively seek to reform the Series B Leasehold Deed of Trust and Security Agreement and the Indenture of Trust with regard to the provisions in those documents granting equal priority to the Series A and Series B bondholders. It may be that FSLIC can establish that the principle adopted in *Weir v. Bauer* applies to these facts, but because FSLIC is seeking a priority position it would be unfair at this time to allow it to foreclose before a determination is made by this court, the District Court of Missouri

or other court of competent jurisdiction as to whether Homestead or Darrell Deason played a culpable role in the bond transaction. Therefore this court determines that the status quo should be maintained at the present time. Accordingly, FSLIC's second claim for relief is held in abeyance pending determination as to the aforesaid issues.

## V. *Guarantee Agreement—FSLIC's Twenty-first Claim for Relief*

Defendants Peter F. Edelman, Robert L. Schwartz, Henry R. Silverman and Adrian B. Werner as partners in Provo Excelsior Limited desired to increase the marketability of the Series B bonds and accordingly executed personal guarantees to Mercantile as trustee for the Series B bondholders. The guarantee agreement provides that upon default

Trustee may, and if requested so to do by the owners of not less than twenty-five percent (25%) in aggregate principal amount of the Series 1983 B Bonds then outstanding, and upon indemnification as hereinunder provided, shall be obligated to proceed hereunder, and Trustee, in its sole discretion, shall have the right to proceed first and directly against Guarantors under this Guarantee without proceeding against or exhausting any other remedies which it may have and without

---

... it being understood and intended that no one or more owners of the Bonds shall have any right in any manner whatsoever to affect, disturb or prejudice the lien of this Indenture by its, his, her or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided for the equal and ratable benefit of the owners of all Outstanding Bonds.

8. In *Weir* the plaintiff and defendant Bauer were the sole bondholders and sole shareholders of the defendant corporation. Bauer had a majority of the bonds and shares and served as president of the corporation. The Utah court recognized that Bauer controlled whether the corporation paid interest on the bonds or dividends on the stock. In those circumstances the court determined that the provision in the trust deed requiring a majority demand upon the trustee for foreclosure was

not one where such restrictive provision ... is to be given effect for the better protection and

security of all outstanding bondholders, but one where the provision is resorted to and asked to be given effect for the gain and advantage of the majority holders and to the prejudice and injury of the minority.

*Id.* 286 P. at 944.

9. Mercantile does not deny that it has taken a position adverse to the Series B bondholders but it distinguishes *Weir* on the basis that here there are more than two bondholders and it is not futile for the FSLIC to seek the support of those bondholders and comply with the express condition precedent of the Indenture of Trust. Mercantile also points out that the disposition of any proceeds realized from a foreclosure sale is a separate issue from the foreclosure itself. Mercantile argues that its decision not to foreclose at this time is not based upon "hostility" towards the Series B bondholders but upon "considered judgment that a voluntary sale of an ongoing business is likely to bring a higher price for the bondholders than the forced sale of a closed building."

resorting to any other security held by Issuer [Provo City] or Trustee.

The basis of Mercantile's motion to dismiss the claim by FSLIC for enforcement of the guarantee agreement is that FSLIC had not demanded that Mercantile enforce the agreement. At oral argument this court directed FSLIC to make formal written demand if it desires to do so, and required Mercantile to respond to that demand in writing. By letters dated February 5, 1987, and February 9, 1987, FSLIC has made formal demand upon Mercantile and by letter dated February 27, 1987 Mercantile has responded. In Mercantile's response it outlines its theory that Darrell Deason and Homestead participated in the fraud relating to the SISCorp standby commitment and that as a result Mercantile "had a duty to all Provo bondholders to file a suit in equity to seek a judicial determination of the rights of the parties." Mercantile also states that assuming certain contingencies the District Court of Missouri will determine what action Mercantile should take with regard to the guarantee agreement. Finally, Mercantile's letter advises FSLIC that it would require adequate indemnity as called for in the guarantee agreement. This issue and the request for instructions now pending before the United States District Court in Missouri are not before this court.

The motion to dismiss based upon failure by FSLIC to make formal demand is denied since that defect has been cured.

VI. *Subject Matter Jurisdiction Over Claims Against FSLIC—Counterclaims of the Provo Excelsior Parties*

■ The Provo Excelsior Parties filed counterclaims against Homestead in this case alleging fraud, violation of state and federal securities laws and state and federal racketeering laws. On October 10, 1986, Homestead was placed in receivership by the Federal Home Loan Bank Board and FSLIC has subsequently been substituted as plaintiff here. FSLIC has brought a motion to dismiss all of the asserted counterclaims on the basis that (1) Congress has granted to FSLIC exclusive jurisdiction to adjudicate claims against the assets of a savings and loan association placed in receivership with judicial review available through the Administrative Procedure Act, 5 U.S.C. §§ 701–06; and (2) FSLIC enjoys sovereign immunity.

FSLIC relies heavily on *North Mississippi Savings & Loan Association v. Hudspeth,* 756 F.2d 1096 (5th Cir.1985) and district court cases following *Hudspeth* which have adopted the analysis here asserted by FSLIC. The beginning points in that analysis are two provisions of federal law and corresponding regulations, all of which deal with FSLIC's receivership powers. The first statutory provision provides:

Except as otherwise provided in this subsection, *no court may* take any action for or toward the removal of any conservator or receiver, or, except at the instance of the Board, *restrain or affect the exercise of powers or functions of a conservator or receiver.*

12 U.S.C. § 1464(d)(6)(C) (emphasis added). The second statutory provision provides:

In connection with the liquidation of insured institutions, *the corporation shall have power* to carry on the business of and to collect all obligations to the insured institution, *to settle, compromise, or release claims in favor of or against the insured institutions, and to do all other things that may be necessary in connection therewith,* subject only to the regulation of the Federal Home Loan Bank Board.

12 U.S.C. § 1729(d) (emphasis added). FSLIC also relies on regulations enacted by the Federal Home Loan Bank Board including the following:

The receiver shall allow any claim reasonably received and proved to its satisfaction. *The receiver may wholly or partly disallow any creditor claim* or claim of security, preference, or priority not so proved, and shall notify the claimant of the disallowance and the reason therefor.... Unless, within 30 days after notice is mailed, the claimant files a written request for payment regardless of the disallowance, *disallowance shall*

*be final,* except as the board may otherwise determine.

12 C.F.R. § 549.4(b) (1986) (emphasis added). Based upon the above statutory provisions and regulations the Fifth Circuit in *Hudspeth* concluded:

> As the FSLIC points out ... resolution of even the facial merits of claims outside of the statutory reorganization process would delay the receivership function of distribution of assets: the FSLIC would not be able to determine how much to pay other claimants until the termination of the parallel litigation. Given the overriding Congressional purpose of expediting and facilitating the FSLIC's task as receiver, such a delay is a "restraint" within the scope of the statute.

*Hudspeth,* 756 F.2d at 1102.

In a recent opinion entitled *Morrison-Knudsen v. CHG International,* 811 F.2d 1209 (9th Cir.1987) the Ninth Circuit carefully reviewed the legislation and regulations cited in *Hudspeth* as well as other relevant statutes and case law.[10] The Ninth Circuit in a very well-reasoned opinion concluded that *Hudspeth* was incorrectly decided and that Congress did not intend to confer upon the FSLIC the adjudicatory power it seeks to establish. The court in *Morrison-Knudsen* was not unsympathetic to the problems facing FSLIC as a result of unprecedented strain on its insurance but declined to engage in "wholesale revision of an agency's statutory authority" in response to conditions arising after the relevant statutes were enacted. The court focused upon each of the statutes here asserted by FSLIC to be the basis for finding adjudicatory power. First, looking at 12 U.S.C. § 1464(d)(6)(C), the court noted that *Hudspeth* relied on the "restrain or affect"

language to conclude that not granting adjudicatory power would unduly burden FSLIC. The Ninth Circuit persuasively pointed out, however, the judicial review pursuant to the Administrative Procedure Act would no less "restrain or affect" the receiver than original court adjudication. The court also observed that the section of law in question does not of itself grant additional powers to FSLIC, but merely restricts interference with powers already possessed by FSLIC pursuant to other express statutes.

FSLIC's next argument is that the grant of power under 12 U.S.C. § 1729(d) "to settle, compromise, or release claims ... and to do all other things that may be necessary in connection therewith ..." establishes adjudicatory authority in FSLIC.[11] In *Morrison-Knudsen* the court pointed out that FSLIC places too much emphasis on the word "necessary" in light of the overall statutory scheme which evidences an intent for FSLIC to be a *receiver,* not an *adjudicator.* Further, the terms "settle" and "compromise" suggest that the claimant had the power to take the claim to court to be adjudicated rather than merely being subject to a simple recognition or lack of recognition by an all powerful adjudicative body.

The *Morrison-Knudsen* court also rejected FSLIC's reliance on the regulations allowing FSLIC to disallow claims. 12 C.F.R. § 549.4(b), stating that these provisions simply give the FSLIC power either to pay or refuse to pay a claim in the same way that an insurance company is authorized to "disallow" claims made against it. In either case, adjudication of the merits of the claim is not foreclosed.

---

**10.** *See Id.* at 1215–22.

**11.** Prior to the 1983 amendment to § 1729(d) the statute provided that FSLIC's power to settle, compromise or release was subject to regulation "of the court or other public authority having jurisdiction over the matter." It would appear by negative implication that the change made clear that in its role as receiver in the settlement and compromise arena, FSLIC is wholly unfettered and not subject to regulation by the courts or any other public authority.

That does not suggest to this court that where such claims are sought to be adjudicated rather than settled, compromised or released FSLIC becomes an adjudicatory body. To the contrary, it would appear that it continues to be subject to the plenary power of the court in adjudicatory matters. In all events we consider that to be so where, as here, FSLIC take an aggressive position as plaintiff or counterclaimant in litigation.

Finally, the *Morrison-Knudsen* court focused upon several other statutes not cited in *Hudspeth* which contradict FSLIC's position.[12] The court also cited numerous cases which evidence that FSLIC's long-standing position has been to recognize that claims against the assets of the receiver may be adjudicated in federal court.[13]

Based upon the thorough analysis by the court in *Morrison-Knudsen,* this court rules that FSLIC does not have adjudicative powers over the counterclaims asserted by the Provo Excelsior Parties. This court also agrees with the court in *Morrison-Knudsen* that FSLIC's argument for sovereign immunity adds nothing and is essentially the same argument as that advanced with regard to FSLIC's adjudicatory powers. Under 12 U.S.C. § 1725(c)(4) FSLIC may "sue and be sued, complain and defend, in any court of competent jurisdiction in the United States...." Accordingly, FSLIC's motion to dismiss the counterclaims of the Provo Excelsior Parties is denied.

## VII. *Third Party Complaint*

In the Third-Party Complaint the Provo Excelsior parties have asserted claims against a number of parties including the shareholders and directors of SISCorp. Those claims are based upon federal and state securities laws, federal and state racketeering laws, and common law claims for fraud and negligence. The Northwest Defendants and the Third Party Savings and Loan Defendants have brought motions to dismiss the claims asserted against them based upon (1) failure to state a claim in that the SISCorp loan standby loan commitment is not a security for purposes of the securities laws or racketeering laws; (2) failure to allege a "pattern" with regard to the racketeering claims, and failure to plead the racketeering claims with the requisite particularity; (3) lack of personal jur-

isdiction over the defendants; and (4) improper venue.

## A. *SISCorp Standby Commitment as a "Security"*

The parties in this case have each cited what they consider to be dispositive Tenth Circuit law on the issue of whether the SISCorp standby loan commitment is a security. The Provo Excelsior Parties rely on *United States v. Austin,* 462 F.2d 724 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972). The *Austin* case involved a criminal prosecution for a fraudulent scheme relating to loan commitments. Although the prosecution focused upon a single "lead transaction," the court acknowledged that the defendants had engaged in numerous other transactions with the same results. The essential scheme was that the defendants would provide loan commitment letters purporting to grant mortgage loans in return for the payment of an advance fee. The loan commitment was not outright but rather was a back-up commitment guaranteeing the making of loans by others. The arrangement was that when financing from the promised lenders failed to materialize, new lenders could be brought into the picture to "guarantee" financing. The Tenth Circuit determined that within the circumstances of that case which involved a large scale loan swindle scheme, the loan commitment came within the "evidence of indebtedness" language of the definition of security contained in the Securities Act of 1933, 15 U.S.C. § 77b(1). The court observed that " 'evidence of indebtedness' is not limited to a promissory note or other simple acknowledgment of a debt owing and is held to include *all contractual obligations to pay in the future for consideration presently received.*" 462 F.2d at 736 (emphasis added). In applying the above language to

---

12. 811 F.2d at 1219–21. The court pointed out after a discussion of these statutes that Congress when granting exclusive adjudicatory powers has been express and detailed in its statutory language.

13. *See FDIC v. Bank of America Nat'l Trust & Sav. Ass'n,* 701 F.2d 831 (9th Cir.); *cert. denied,*

469 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983); *First Empire Bank v. FDIC,* 572 F.2d 1361 (9th Cir.1978); *Argonaut Savings & Loan Ass'n v. FDIC,* 392 F.2d 195 (9th Cir.); *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968).

the fraudulent documentation there encountered, the court concluded the

> letter of commitment was sold for a substantial consideration, and the buyer received what appeared to be an enforceable obligation which contemplated the flow of funds. It indicated a binding and legally enforceable right. Therefore, we can find no fault with the ruling of the trial court insofar as it regarded the letter of commitment as plainly being a security.

*Id.*

The third-party defendants rely on *McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*, 562 F.2d 645 (10th Cir.1977) which was decided five years after *Austin*. In *McGovern* the plaintiffs were seeking financing to build a hotel. One of the defendants, First of Denver Mortgage Investors, issued for consideration of $15,000 a loan commitment to provide interim construction financing to plaintiffs upon the condition that plaintiffs secure a permanent loan commitment. Thereafter plaintiffs paid $240,000 to defendant B.F. Saul Advisory Company which agreed to provide a permanent loan commitment. Neither of the loan commitments was carried out and the plaintiffs sued under the Securities Act of 1933 and the Securities Exchange Act of 1934. The Tenth Circuit framed the issue as "whether either a construction loan commitment, or a permanent loan commitment, purchased by a real estate developer in the normal course of business from a bona fide lender, is a 'security'...." *Id.* at 646. The court analyzed the commitment letter in light of *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 wherein the Supreme Court held that the test for an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." In that light the Tenth Circuit determined that although building a hotel was an investment, the plaintiffs were in no sense relying on the efforts of either defendant but rather on their own efforts to make the construction of the hotel a profitable venture. The Tenth Circuit also distinguished the facts in *McGovern* from situations where notes are considered to be securities for purposes of the securities laws. The court noted the distinction between a "commercial note" and an "investment note," the latter being involved when "the transaction is of a kind in which stock often is actually given." *McGovern*, 562 F.2d at 647 (quoting *Zabriskie v. Lewis*, 507 F.2d 546, 551 (10th Cir.1974)).[14] The court then concluded "this is not the kind of transaction in which stock might be given." 562 F.2d at 647.

In determining whether the facts of this case fall within the rule of *Austin* or *McGovern* the most significant statement is that of the Tenth Circuit itself:

> It is true that we held that the loan commitment letter in [*Austin*] was a security within the meaning of the 1933 act. However, in our view the loan commitments in the present case are dissimilar to the loan commitments in *Austin. Austin*, a criminal case, involved a *large-scale, advance-fee, loan swindle in which the defendants issued, along with false financial statements, not outright*

---

14. A number of courts have focused upon the commercial versus investment distinction in determining whether a note transaction ought to come with the parameters of the securities laws or is better left to the operation of other regulatory laws. *See Futura Development Corp. v. Centex Corp.*, 761 F.2d 33, 39–40 (1st Cir.1985) (discussing the varying positions and tests of the circuit courts). The central focus under the commercial/investment test is "the investor's dependency on the efforts of others and the investor's dependency upon financial disclosures provided by the other party." *Id.* at 40–41. The factors considered in making the above determination are the size of the offering; necessary reliance on the issuer; the purpose of the issuer in execution the note and the payee accepting the note; the economic inducements held out to the prospect; the degree to which the profit on the note is in the hands of the maker rather than the payee; whether the object of the holder was to acquire an interest in the property or enterprise; whether the note was primarily commercial because it was serving as a "cash substitute" for the purchase price; and whether the return on the note was predetermined or could reasonably be anticipated, or was subject to the managerial efforts of the maker. *Id.*

*commitments, but back-up commitments guaranteeing the making of loans by others.* Plaintiffs were induced, by advertising and solicitation, to put up money with the expectation of profits. *The entire procedure was fraudulent and no loans were ever made.* Suffice it to say, we believe the instant case to be distinguishable from *Austin.*

*McGovern,* 562 F.2d at 648 (emphasis added).

This court believes that the allegations of the Provo Excelsior Parties come within the distinction made by the Tenth Circuit in *McGovern.* Here, as in *Austin,* the allegations are that David Namer, as President of FMS and acting as agent for SISCorp, negotiated for receipt of commitment fees totalling $680,000 in return for a *guarantee that loans would be made by others.* The Provo Excelsior Parties have alleged with regard to the 1981 SISCorp standby commitment that in fact SISCorp was in no position actually to perform and that no binding participation agreements had ever been obtained. Thereafter when the Provo Excelsior Parties were contemplating requiring SISCorp to perform the 1981 commitment, David Namer and FMS "steered" the Provo Excelsior Parties away from that course and exerted efforts to put together municipal bond financing secured by a new SISCorp standby commitment at a cost of $536,775. It is alleged that binding participation agreements were never obtained in relation to the 1983 commitment and as a result the commitment was not honored. The Provo Excelsior Parties have also outlined in their complaint a similar scheme in relation to municipal bonds of the City of Minot, North Dakota. It is alleged that in relation to that bond issue, SISCorp issued a standby commitment for a fee of $321,000 that has not been honored and for which SISCorp disclaims any knowledge.

Third-party defendants argue that whatever factual similarities there are between the present case and *Austin* cannot be unduly emphasized without considering the proper test of whether the loan commitment resembles an *investment* or a *commercial* transaction.[15] However, the court believes that by distinguishing *Austin* the Tenth Circuit recognized that a large scale "loan swindle" falls on the investment side of the line. Here, as in *Austin* large investments of money were made with the expectation that another party would undertake efforts to find third parties interested in making loans and would enter into binding agreements to make those loans.[16] Those facts are distinguishable from the outright loan commitments in *McGovern* made by "bona fide lender[s]." Accordingly, the motions of the third party defendants are denied.[17]

---

**15.** *See LTV Federal Credit Union v. UMIC Government Securities, Inc.,* 523 F.Supp. 819, 830 n. 30 (N.D.Tx.1981) ("[A] literal construction of *Austin* does not draw any distinction between commercial transactions and investment transactions. If *Austin* is correct that 'all contractual obligations to pay in the future for consideration presently received' are evidence of indebtedness; then all commercial notes are securities."

**16.** The third party defendants cite *United States v. Namer,* 680 F.2d 1088 (5th Cir.1982) for the proposition that a loan commitment or standby commitment as is involved in this case is not a security. In that case the Fifth Circuit determined that clients came to defendant David Namer "not with the expectation of profits, ... but with hopes of obtaining fixed loan commitments." The court also cited *North American Int'l Dev. Ltd. v. Allied Consultants, Inc.,* No. 77–C–3593, slip op. at 5–6 (N.D.Ill. Jan. 31, 1979) and described that case as a civil action against David Namer wherein the court relied on the Tenth Circuit's opinion in *McGovern* to conclude that loan commitments were not securities. *Namer,* 680 F.2d at 1097 n. 18. There is insufficient description in *United States v. Namer* and *North American Int'l Dev. Ltd.* to determine whether the scheme alleged in either case is similar to that alleged here. In addition, the court in *United States v. Namer* concluded that the "Tenth Circuit's decision in *McGovern* substantially narrowed that court's earlier decision in *United States v. Austin....*" 680 F.2d at 1096 n. 16. While that statement may be true on its face, this court is compelled to follow the careful distinction drawn between the two cases as articulated by the Tenth Circuit in *McGovern.*

**17.** The court notes that in *McGovern* the Tenth Circuit emphasized that "[w]hether a particular investment constitutes a security depends upon the facts and circumstances of the case." 562 F.2d at 648 (quoting *Vincent v. Moench,* 473 F.2d 430, 435 (10th Cir.1973)). However, the ruling here is based solely on the allegations in

## B. *Racketeering Claims*

The third party defendants argue that the Provo Excelsior Parties have not alleged a "pattern of racketeering" for purposes of their claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 and their claim under the Utah Racketeering Influences and Criminal Enterprise Act ("RICE"), Utah Code Ann. §§ 76–10–1601 to –1608 (Supp.1986). The third party defendants contend that although there are allegations of multiple criminal episodes in the complaint, only a single criminal episode has been set forth with sufficient particularity and that a single episode is insufficient to satisfy the RICO and RICE pattern requirements.

### 1. Particularity in Pleading RICO Claims

 The third party complaint contains allegations of three separate fraudulent transactions: (1) the 1981 SISCorp standby commitment relating to he Provo City bonds; (2) the 1983 SISCorp standby commitment relating to the Provo City bonds; and (3) the 1983 SISCorp standby commitment relating to the Minot City bonds. This court considers the allegations in the complaint to be sufficient with regard to all three transactions. The Provo Excelsior parties have alleged specifically the time, place and content of misrepresentations of John Hudson, as attorney and agent for SISCorp, with regard to whether the 1983 SISCorp standby agreement was in fact funded by binding participation agreements. Although the allegations regarding the 1981 SISCorp commitment and the Minot City commitment are less detailed, the deficiencies are not fatal here.[18] The court recognizes the dilemma of requiring parties to plead a pattern of racketeering with particularity in that a description of the alleged pattern may require pleading the existence of a fraudulent scheme separate from the scheme directly involving the plaintiffs. In such cases the pleading of such separate scheme with perfect particularity may be impracticable, and the degree of particularity may be relaxed somewhat. Here, it is natural that the Provo Excelsior Parties at this point in the litigation would not have possession of every relevant fact regarding the SISCorp standby commitment for the Minot City bonds.[19]

the complaint. When all of the facts and circumstances become clear the court may consider whether the distinction made in *McGovern* is still applicable.

**18.** In *Grant v. Union Bank*, 629 F.Supp. 570, 576 (D.Utah 1986) this court acknowledged that at a minimum the strict pleading requirements of Rule 9(b) of the Fed.R.Civ.P. must be met with regard to allegations of fraud in pleading a RICO claim. However, in the subsequent case of *Huntsman-Christensen Corp. v. Mountain Fuel Supply Co.,* No. 86–C–530G, slip op. at 6–9 (D.Utah Nov. 24, 1986) [Available on WESTLAW, DCT database], this court recognized that in special circumstances RICO claims may proceed even though not every allegation meets the strict requirements of Rule 9(b). In that case the complaint put the RICO defendants on notice so as to enable them fairly to understand and defend against such claims; a number of instances of predicate acts or transactions were alleged with a great deal of particularity; there was significant background information, including the relationship and affiliation of the various defendants; and whatever particularity was missing was peculiarly within the knowledge of the perpetrators of the fraud. The factors recognized in *Huntsman-Christensen* are present here as well.

**19.** In *Dominicus Americana Bohio v. Gulf & Western Industries,* 473 F.Supp. 680, 693 (S.D.N.Y.1979) the court recognized that the strict requirements of Rule 9(b) may be relaxed when the allegations relating to fraud allegedly were perpetrated by the defendant not upon the plaintiff but upon a third party. In such cases the court acknowledged that the circumstances surrounding the transaction are peculiarly within the defendant's knowledge and therefore the proper action is to deny the motion to strike the claims, without prejudice to renewal if plaintiffs are unable to support their claim after an opportunity for discovery. In *Huntsman-Christensen Corp. v. Mountain Fuel Supply Co.,* No. 86–C–530G, slip op. at 8 n. 5 (D.Utah Nov. 24, 1986) [Available on WESTLAW, DCT database] this court accepted the principle of *Dominicus* but ordered the flip side relief by dismissing claims against particular plaintiffs without prejudice and with leave to amend. The reason for that ruling was that the motion went to particular defendants for which there was acute concern regarding damage to their reputations as a result of the allegations. This case fits within the *Dominicus* situation and on that basis is denied.

## 2. Pattern of Racketeering Activity

The complaint also must be analyzed to determine whether a pattern of racketeering activity has been alleged. In *Thompson v. Wyoming Alaska, Inc.*, 652 F.Supp. 1222 (D.Utah 1987) this court recently examined the meaning of pattern [20] and stressed with respect to demonstrating the continuity requirement that the most relevant factors are the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. Applying these factors to the case at bar, a "pattern of racketeering activity" has been adequately alleged. Here, the Provo Excelsior parties have alleged several counts of securities fraud in relation to the 1983 SISCorp standby commitment for the Provo City bonds, two instances of mail fraud and one instance of wire fraud. The complaint also alleges that similar methods were used fraudulently to obtain the 1981 SISCorp standby commitment and the standby commitment relating to the Minot City bonds, although the Provo Excelsior Parties have no standing to assert a securities fraud claim for damages in relation to either of those claims.[21] The allegations cover a period of time from 1981 until 1983. In addition, although few parties were in privity with SISCorp in contracting for the three standby commitments, those agreements ran for the benefit of over a thousand investors in relation to the Provo City bonds alone, thereby resulting in numerous independent injuries. Another very significant factor is that there are allegations of two separate schemes, one in relation to the Provo City bonds and another in elation to the Minot City bonds. In sum, those allegations demonstrate a design or arrangement which evidences that the alleged fraudulent standby commitments were "a regular part of the way [the third party defendants do] business." *Id.* at 1228.

The activities in relation to the three standby commitments also demonstrate relatedness in that all are related to the affairs of the enterprise. As a result, the motions to dismiss the RICO and RICE claims are denied.

### C. *Personal Jurisdiction*

Third party defendants argue that personal jurisdiction in this case cannot be obtained over them because (1) no security is involved and therefore the national service of process provision of 15 U.S.C. § 78aa does not apply; (2) venue with regard to the RICO claims is improper and therefore the national service of process provision of 18 U.S.C. § 1965 cannot be used; and (3) jurisdiction is not proper under the Utah long-arm statute, Utah Code Ann. § 78–27–24 (1977).

This court has determined that the Provo Excelsior Parties have stated a claim under the securities laws by alleging that the standby loan commitment is a security. Therefore, under 15 U.S.C. § 78aa nationwide service of process may be made, and under case authority jurisdiction is proper if the defendant had minimum contacts with the United States, regardless of the defendant's contacts with the forum district.[22] Here, the third party defendants

---

**20.** The court said:

"Pattern of racketeering activity," then, is a design or arrangement of predicate acts which manifests both relatedness and continuity. This court conceives this to mean that in addition to the presence of design or arrangement there must be a separation in time and place of acts related to each other and/or the affairs of the Enterprise, and an ongoing or repetitive characteristic of such acts. The number of acts under RICO required to establish a civil cause of action is not set forth in the statute, but there must be "at least two." In a proper case it may be possible to demonstrate design and arrangement plus relatedness and continuity with just two acts, but depending on the predicate offense involved often more than two and perhaps many "acts" may be necessary.

*Id.* at 1224.

**21.** The 1981 SISCorp standing commitment was never called and the Provo Excelsior Parties were not involved with the Minot City bonds.

**22.** *See Semegen v. Weidner,* 780 F.2d 727, 730 (9th Cir.1985); *F.T.C. v. Jim Walter Corp.,* 651 F.2d 251, 256 (5th Cir.1981); *Mariash v. Morrill,* 496 F.2d 1138, 1143 (2nd Cir.1974); *Ruggieri v. General Well Service, Inc.,* 535 F.Supp. 525, 535 (D.Colo.1982); *see also Contintental Graphics v.*

who have brought a motion to dismiss are citizens and have sufficient contacts with the United States to assert due process. In addition, the trend of authority is that if personal jurisdiction is obtained pursuant to 15 U.S.C. § 78aa, personal jurisdiction will also be present for all state claims that properly can be considered to be pendent.[23]

██ Apparently, third party defendants dispute jurisdiction over the parties for purposes of asserting the RICO claims even in the presence of personal jurisdiction over the parties with regard to the securities law claims and the pendent claims.[24] However, third party defendant's own authority supports the view that personal jurisdiction is obtained for purposes of all claims. Third party defendants have cited *Clement v. Pehar*, 575 F.Supp. 436 (N.D.Ga.1983) wherein claims were asserted based upon the securities laws and RICO. In *Clement* the court held that pursuant to the nationwide service of process provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and the RICO act, 18 U.S.C. § 1965(d) the court "may constitutionally exercise jurisdiction over [defendants]" so long as the defendants have minimum contacts with the United States. *Id.* at 439. The court then determined that once jurisdiction is found, differences between the securities statute and the RICO statute more properly may be analyzed in terms of venue. This court agrees with that analysis.

D. *Venue*

By letter and accompanying Conditional Transfer Order dated April 17, 1987, this court was informed that pursuant to Rule 9 of the *Rules of Practice of the Judicial Panel on Multidistrict Litigation*, 89 F.R.D. 273, 278–79 this case has been conditionally transferred to the Western District of Oklahoma. The Order does not become effective until fifteen days from entry and is stayed beyond that time if a party objects to the Order. In light of that development this court has determined that the District Court for the Western District of Oklahoma is the preferable forum to analyze whatever venue issues, if any, remain.

This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.

---

*Hiller Industries,* 614 F.Supp. 1125, 1129–30 (D.Utah 1985) (discussing the sufficiency of contacts with the United States so as to satisfy due process in the context of the Foreign Sovereign Immunities Act).

**23.** *See Internat'l Controls Corp. v. Vesco,* 593 F.2d 166, 175 n. 5 (2nd Cir.1979); *Oetiker v. Werke,* 556 F.2d 1, 4–5 (D.C.Cir.1977); *Robinson v. Penn Central Co.,* 484 F.2d 553, 555 (3rd Cir.1973); *see generally* 4 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE ¶ 1125 at 522–29 (1969) (citing cases).

**24.** In this regard third party defendants have cited *Wood v. Santa Barbara Chamber of Commerce,* 507 F.Supp. 1128, 1148 (D.Nevada 1980) wherein the court held that the extraterritorial

service provided for in the antitrust law can be validly invoked only if venue is proper in the district where the suit is filed. *See also First Fed. Sav. & Loan Ass'n of Pittsburg v. Oppenheim, Appel, Dixon & Co.,* 634 F.Supp. 1341, 1349 (S.D.N.Y.1986) ("Because the venue requirements of Section 27 [15 U.S.C. § 78aa] are inextricably intertwined with the statutory grant of personal jurisdiction ... it follows that proper venue is a prerequisite to valid *in personam* jurisdiction and any challenge to venue is in a sense a challenge to jurisdiction.") Here, however, service is properly made pursuant to the securities laws therefore resort need not me made to the RICO service statute.